Robert B. VANCE, D.O., Plaintiff
and Appellant,

v.

Paul T. FORDHAM, Director of the Department of Registration; Department of Registration, State of Utah and the Osteopathic Committee, Defendants and Respondents.

No. 18176.

Supreme Court of Utah.

Aug. 22, 1983.

M. Richard Walker, Salt Lake City, for plaintiff and appellant.

David L. Wilkinson, Atty. Gen., Steven G. Schwendiman, Asst. Atty. Gen., Salt Lake City, for defendants and respondents.

OAKS, Justice:

Appellant, an osteopathic physician, had his license revoked by respondent, Director of the Department of Registration. The revocation was for "unprofessional conduct" pursuant to a recommendation of the Department's Osteopathic Committee after the notice and hearing specified in U.C.A., 1953, §§ 58–1–25 to –33. The district court sustained the administrative action.

On this appeal from the district court, appellant challenges the sufficiency of the evidence for the administrative finding and the legality of a revocation for "unprofessional conduct" when the Department has not published regulations defining what professional conduct is forbidden under that standard. Appellant also challenges the statutory qualifications of one of the three members of the Osteopathic Committee who recommended the revocation, contending that this deficiency ousted the Committee of its jurisdiction and deprived him of his license without due process of law.

Appellant graduated from the Kirksville (Mo.) College of Osteopathic Medicine in 1958. During the next several years, he completed an internship at an osteopathic hospital in Michigan, obtained other postgraduate experience in several different states, and acquired licenses to practice his profession in Indiana, Michigan, Missouri, and Ohio. Since 1961, he has been licensed and has practiced his profession in Utah. Apart from these uncontested facts, the parties characterize appellant in sharply different terms.

Appellant's brief represents appellant as a distinguished professional who has dedicated hundreds of hours to research and study with many of the leading practitioners and pioneers in the field of medicine, averaging eight to ten medical conventions and seminars each year to advance his knowledge in order to assist suffering patients. He is nationally recognized in the

field of preventive medicine and has been certified by the American Academy of Medical Preventics as a Diplomate in chelation therapy.[1] He has treated some 8,000 persons over the past decade, only 35 of whom were selected as the subject matter of the petition filed against him, and only 8 of these were the subject of adverse findings by the Department.

In respondent's brief, appellant is characterized as one who utilized methods and mechanisms totally foreign to the practice of medical doctors or osteopaths and whose diagnostic abilities are founded upon questionable theory rather than scientific knowledge. Respondent relies on the findings of the Department and its Osteopathic Committee that appellant did not maintain the "basic (orthodox) standards of medicine" in his practice. Specifically, he did not do a complete physical examination before giving intravenous solutions or before assuming primary care of patients by advising them to discontinue medications or instructions given them by their previous physicians, and he prescribed chelation therapy (an "unnecessary and unproven medical treatment for atherosclerosis") and laetrile (which "should not be prescribed in lieu of standard accepted medical treatment for a patient suffering from cancer"). Respondent also cites the findings that appellant used the "totally unfounded" method of kinesiology "as the sole test to determine food allergies," that he employed Kirlian photography for research purposes without notifying the patient that its use as a diagnostic tool was of questionable value, and that he was grossly negligent in assuming the primary care of and in treating a gravely ill patient whose condition was beyond the scope of appellant's knowledge in the field of preventive medicine.

It is not the function of this Court to pass judgment on the professional qualifications or practices of appellant, or even to resolve the conflicts between his supporters and his detractors. Our function is limited to assuring the legality of and compliance with the process the law has established to regulate the professions in the public interest. *State v. Hoffman,* Utah, 558 P.2d 602 (1976); *Baker v. Department of Registration,* 78 Utah 424, 442–45, 3 P.2d 1082, 1090–91 (1931).

## I. THE PROCEEDINGS BELOW

Several of appellant's allegations of error turn on whether the proceedings in the district court were in the nature of an appeal under § 58–12–35.1 or an original action under § 58–1–36. We begin with that determination.

On September 30, 1980, an investigator for the Department of Registration signed a 16-page petition making detailed allegations of thirty-seven instances of unprofessional conduct by appellant in the treatment of various patients. During six days in January and on February 1, 1981, the Department held a hearing on these allegations before an administrative law judge and the three-member Osteopathic Committee. This Committee, appointed by the Director of the Department of Registration with the approval of the Governor, performs statutory functions in examining and licensing and in reviewing the professional conduct (including revoking licenses) of members of the osteopathic profession. §§ 58–1–5 to –36.

Thirty-five witnesses testified at the hearings, including appellant, seven M.D.s, two D.O.s (one of whom was also an M.D.), and twenty-five other witnesses. Most of the other witnesses were patients of appellant. Most of the M.D.s testified on the care of particular patients. On the subject of medical standards generally, one D.O. from Utah testified against appellant and three M.D.s (one of whom was also a D.O.) from California testified for him.

On February 2, 1981, the Osteopathic Committee found unprofessional conduct under seven of the allegations and recommended that appellant's license be revoked. On February 6, 1981, respondent, as Di-

---

1. Chelation therapy involves the intravenous administration of a chemical solution to relieve poor circulation caused by hardening of the arteries.

rector of the Department, approved the Committee's recommended findings and conclusions and revoked appellant's license, effective immediately. On February 10, 1981, appellant's counsel, who had represented him at the hearing, filed an "appeal" to the district court "[p]ursuant to Section 58–12–35.1(5)." Appellant has been permitted to continue his practice during the pendency of his appeals under a succession of stays issued by the district court and by this Court. In the summer of 1981, appellant's original counsel withdrew and was replaced by his present counsel.

On October 2, 1981, appellant moved to dismiss the order of revocation and the appeal and to reinstate appellant's license on the basis that one of the three members of the Osteopathic Committee, Dr. Katherine Greenwood, had been licensed in the state of Utah since June 6, 1978, a period of less than three years at the time of her appointment on January 5, 1981, whereas § 58–1–6 clearly requires at least five years.[2] After briefing and argument, at which appellant's counsel stated that this deficiency had just been discovered in mid-September, the district court denied the motion on October 19, 1981. The court's memorandum opinion gave three reasons:

1. Although not qualified for appointment to the Osteopathic Committee, Dr. Greenwood was a de facto officer, who acted under color of law and authority, so there was no absence of jurisdiction in the committee.

2. The revocation had been recommended by the requisite majority of the committee without Dr. Greenwood's vote.

3. Even if the decision of the Committee were voidable by reason of Dr. Greenwood's lack of qualifications, that decision could only be voided at the instance of an aggrieved party who made a timely protest, and appellant's protest, made for the first time on appeal, was untimely. We review that decision in Part IV of this opinion.

Both parties then filed lengthy memoranda arguing their respective positions on the basis of the transcript of the hearings before the Committee, which had been filed in the district court. Neither party sought to introduce any other evidence. The memoranda of both parties referred to the proceeding in the district court as "an appeal." Both reviewed the evidence and argued the issue in terms of whether or not the Department's findings were "arbitrary or capricious."

On December 3, 1981, the district court affirmed the Department's order. The court's memorandum opinion refers to the proceeding as an "appeal" under § 58–12–35.1(5) and applies the arbitrary and capricious standard of review specified in that section and in this Court's decisions on judicial review of administrative decisions, citing *Petty v. Utah State Board of Regents*, Utah, 595 P.2d 1299, 1302 (1979). On the question of the evidentiary support for the findings of the Department, the opinion states that the court had read the entire 1189-page transcript and had examined all of the exhibits and memoranda of counsel. The court concluded that the findings of the Department on the seven instances of unprofessional conduct were "amply and thoroughly supported by testimony and other evidence in the record" and that the other findings (relating to more general matters, such as an osteopathic physician's required standard of care of his patients and the finding that chelation therapy and laetrile were not standard accepted medical treatments) were "based upon testimony in the record, and upon the professional expertise

---

**2.** Section 58–1–6, as then in effect, provided in pertinent part:

Each member of a committee, except members selected from the public at large, must have had a license to practice in this state in the particular field from which selected for a period of five years immediately prior to his appointment and be in good standing in the profession, trade or occupation from which appointed.

Law of Feb. 22, 1979, ch. 19, § 2, 1979 Utah Laws 258, 261 (amended 1981). The five-year requirement has since been omitted, effective May 12, 1981. Law of March 12, 1981, ch. 34, § 3, 1981 Utah Laws 254, 255.

of the members of the Committee." The court concluded:

This Court may not substitute its judgment on factual matters for that of the fact-finding body unless that body has clearly acted capriciously or arbitrarily, or unless its conclusions are unsupported by the evidence. Neither circumstance exists here.

## II. SUFFICIENCY OF EVIDENCE

In this Court, appellant contends that the proceeding in the district court was not a § 58–12–35.1 "appeal" from a decision on medical licensure, but was in the nature of an original action under § 58–1–36, the general section governing appeals from administrative actions on licensing revocations. Consequently, appellant urges, the district court should have reviewed the administrative findings to assure that they were supported by a "clear preponderance of the evidence," Withers v. Golding, 100 Utah 179, 111 P.2d 550 (1941), rather than the less comprehensive review under the "arbitrary and capricious" standard actually employed. From this premise, appellant concludes that the court erred in approving the Department's findings which, he says, are not supported by a preponderance of the evidence.

Appellant's premise is faulty. From the notice of appeal filed by appellant through the memorandum opinion of the district court, the proceeding in the district court was never treated as anything other than an appeal on the administrative record under § 58–12–35.1. It is true that appellant's counsel advised the district court that he considered the proceeding an original action under § 58–1–36 and Withers v. Golding, supra, but that advice was first given on December 17, 1981 (at a hearing on appellant's motion for a stay), after the district court had affirmed the revocation. We are satisfied that this proceeding in the district court was appropriately conducted as an appeal and that the court applied the correct standard of review to the Department's findings. We also hold, despite appellant's strenuous arguments to the contrary, that in ruling on this appeal the district court properly concluded, on the basis of the record evidence, that the Department's findings were not arbitrary and capricious. Those findings were supported by evidence of substance. In addition, as elaborated hereafter, we conclude that the Department's decision on the intermediate issue of the meaning of "unprofessional conduct" was within the limits of reasonableness. Utah Department of Administrative Services v. Public Service Commission, Utah, 658 P.2d 601, 609–12 (1983).

## III. FAILURE TO ELABORATE "UNPROFESSIONAL CONDUCT"

Appellant next argues that the Department cannot suspend his license for "unprofessional conduct" when the Osteopathic Committee had not previously defined unprofessional conduct and published rules and regulations for the protection of the public as was its statutory duty. § 58–1–13(6), (7). He relies on Tuma v. Board of Nursing, 100 Ariz. 74, 593 P.2d 711 (1979), and Megdal v. Oregon State Board of Dental Examiners, 288 Or. 293, 605 P.2d 273 (1980), which upset license revocations because there were no elaborating regulations to put the professional on notice of what practices were proscribed as "unprofessional conduct."

Respondent counters by citing Chastek v. Anderson, 83 Ill.2d 502, 48 Ill.Dec. 216, 416 N.E.2d 247 (1981), which held that a dentist's license could be revoked for "unprofessional conduct" proven by instances of negligence in the care of his patients. Chastek cites a host of cases sustaining that statutory standard against challenges based on violations of due process because of lack of notice or vagueness. Thus, even Megdal, relied on by appellant, held that there was no constitutional violation in the use of this standard, since objections of vagueness that apply to penal laws do not apply to the revocation of professional licenses. Megdal, 288 Or. at 296–303, 316, 605 P.2d at 274–78, 285.

As noted in *Chastek,* both *Tuma* and *Megdal* involved acts not associated with the professional's treatment of his patients. 83 Ill.2d at 505–07, 48 Ill.Dec. at 218, 416 N.E.2d at 249. *Tuma* involved a nurse's interference in the doctor-patient relationship, and *Megdal* involved a dentist's insurance fraud. In the context of the statutes and hearing procedures in those cases, the courts held that "unprofessional conduct" could not be used to revoke licenses without prior rules establishing the standards by which the professionals would be judged. Neither case denied (in fact both apparently conceded) that the standard of "unprofessional conduct" could be applied by expert professionals to judge another professional's conduct in the care of patients. This was the holding in *Chastek.*

*Athay v. State Department of Business Regulation,* Utah, 626 P.2d 965 (1981), is not to the contrary. There, the Department refused to permit an applicant to sit for the examination necessary for certification as a psychologist on the basis that her doctor's degree did not meet the statutory requirement of "a program of studies whose content was primarily psychological." § 58–25–2(2). In reversing that action, this Court held that the Department's "failure to establish guidelines for a curriculum or a criteria for course content which is 'primarily psychological' constituted arbitrary action and deprived plaintiff of her rights of due process of law." 626 P.2d at 968. The Court required "uniform, published, identifiable and objective standards," *id.* at 966, in apparent recognition that prospective professionals who are making large investments of time and money are entitled to specific guidance as to what is necessary for professional certification.

■ Once a professional is certified, however, the public's interest in his or her professional performance in the treatment of patients (or in services to clients) is paramount. It is therefore appropriate for the public to place great reliance on the self-governing functions and standards of the profession. As applied to the treatment of patients (or services to clients), a general

statutory standard like "unprofessional conduct" is acceptable for three reasons: (1) The subject of professional performance is too comprehensive to be codified in detail. (2) Members of a profession can properly be held to understand its standards of performance. (3) Standards of performance will be interpreted by members of the same profession in the process of administrative adjudication. Thus, the public can receive greater protection from a certified professional than from an applicant for certification, because a certified professional can be held to a higher standard of awareness of the profession's uncodified standards in the treatment of patients (or in services to clients) than an applicant.

For the reasons described above, the specific guidelines *Athay* required for certification and *Tuma* and *Megdal* required for other activities are unnecessary to the application of the standard of "unprofessional conduct" to a professional's performance of professional services for patients or clients.

■ In this case, appellant's peers on the Osteopathic Committee judged his treatment of his patients. Granted, the Committee did not codify or publish standards of conduct for osteopaths in advance of the hearing, but the statutes do not mandate advance publication. Section 58–1–13(6) requires the Committee to "[d]efin[e] unprofessional conduct," but in respect to patient care the Committee may do that on a case-by-case basis by drawing on the statutory standards quoted below and on its own knowledge of the patient-care standards of the profession. *Shea v. Board of Medical Examiners,* 81 Cal.App.3d 564, 575–76, 146 Cal.Rptr. 653, 659–60 (1978); *Buhr v. Arkansas State Board of Chiropractic Examiners,* 261 Ark. 319, 322, 547 S.W.2d 762, 764 (1977) (en banc); *In re Mintz,* 233 Or. 441, 378 P.2d 945 (1963); *Reyburn v. Minnesota State Board of Optometry,* 247 Minn. 520, 523–24, 78 N.W.2d 351, 355 (1956). As for § 58–1–13(7), the use of the permissive "may" indicates that the publication of "rules and regulations" is optional with the Committee. The considerations relied on by

the dissent may well require the publication of rules or standards for other aspects of professional conduct, as mentioned above, but we are satisfied that this is not mandatory for the performance of professional services for patients or clients.

■ The petition filed against appellant in this case charged him with "unprofessional conduct" as defined in the Medical Practice Act, § 58–12–36(15), which the petition alleged was applicable to a doctor of osteopathy.[3] The petition specifically quoted that statutory definition as follows:

> [A]ny conduct or practice, contrary to the recognized standards of ethics of the medical profession, or any conduct or practice which does or might constitute a danger to the health, welfare or safety of the patient or the public.

The hearing before the administrative law judge and the Osteopathic Committee went forward using that definition as the applicable standard, and it was specifically applied in the findings and conclusion of the Osteopathic Committee (approved by the Director).[4] The adequacy and appropriateness of that statutory standard were not challenged in the appeal to the district court, where it was also applied.

For all of the above reasons, we reject appellant's contention that he was denied any legal right by applying to him the standard of "unprofessional conduct" without prior elaboration in published standards, rules, or regulations.

## IV. QUALIFICATIONS OF THE OSTEOPATHIC COMMITTEE

■ Appellant contends that Dr. Greenwood's lack of statutory qualification to serve on the Osteopathic Committee (having been licensed less than five years) ousted that Committee of its jurisdiction so its recommendation or revocation of his license deprived him of property without due process of law. As noted earlier, the district court held that this was not a jurisdictional defect and that the Committee's action was valid because Dr. Greenwood was a de facto officer. We agree.

The parties have cited only one Utah case stating the rule that actions of de facto officers will be given effect: *In re Thompson's Estate*, 72 Utah 17, 87, 269 P. 103, 128 (1927) (district judge's de facto authority when sitting with Supreme Court). However, there are hundreds of such cases in other jurisdictions. Reference to a handful of illustrations will suffice.

In a case appealed from the Utah Territory, the United States Supreme Court gave this explanation for its giving effect to the actions of a United States marshall who performed official acts in connection with mortgage foreclosures and was later held to have done so without authority:

> An officer *de facto* is not a mere usurper, nor yet within the sanction of law, but one who, *colore officii,* claims and assumes to exercise official authority, is reputed to have it, and the community acquiesces accordingly. [Citations omitted.] Judicial as well as ministerial offi-

---

**3.** On the facts of this case, we need not determine whether this section of the Medical Practice Act was formally applicable to a doctor of osteopathy at that time. The record is silent on why the parties did not apply or rely on § 58–12–18, which the dissent represents as the solely applicable expression of "unprofessional conduct" for osteopaths. There is no doubt that the parties to this controversy could mutually adopt the language of § 58–12–36(15) as a suitable expression of the patient-care standard of the osteopathic profession, and the record shows that they did so in this case. Significantly, this same statutory formula was included in the Osteopathic Medicine Licensing Act, effective May 12, 1981, U.C.A., 1953, § 58–12–7(15).

**4.** FINDINGS OF FACT

1. We find that osteopathic physicians and surgeons should maintain and uphold the same standards of care as medical doctors in caring for and treating their patients....
. . . .

 CONCLUSIONS OF LAW
... [Appellant] is subject to the provisions of Section 58–12–36(15) ... and ... has committed acts of sufficient severity amounting to unprofessional conduct as set forth in said Section ... on which to base disciplinary action for revocation of his license to practice as an Osteopathic Physician and Surgeon in the State of Utah ....

cers may be in this position. Freeman on Judgments, sect. 148. The acts of such officers are held to be valid because the public good requires it. The principle wrongs no one. A different rule would be a source of serious and lasting evils. *Hussey v. Smith,* 99 U.S. 20, 24, 25 L.Ed. 314 (1878). The "landmark" definition of de facto officers in the much-quoted case of *State v. Carroll,* 38 Conn. 449, 472 (1871), includes an officer who acted under color of an appointment that was "void because the officer was not eligible." [5]

The de facto principle has been applied to reject attempts to upset the actions of various official bodies on the basis that the law made one or more of the members ineligible for service. *E.g., In re Bunker Hill Urban Renewal Project 1B,* 61 Cal.2d 21, 389 P.2d 538, 37 Cal.Rptr. 74 (redevelopment agency decision), *cert. denied,* 379 U.S. 28, 899, 85 S.Ct. 190, 185, 13 L.Ed.2d 173, 174 (1964); *People ex rel. Chillicothe Township v. Board of Review,* 19 Ill.2d 424, 167 N.E.2d 553 (1960) (board of review for real estate assessments); *Olathe Hospital Foundation, Inc. v. Extendicare, Inc.,* 217 Kan. 546, 539 P.2d 1 (1975) (appeals panel decision on certificate of need); *Michell v. Louisiana State Board of Optometry Examiners,* La. Ct.App., 146 So.2d 863 (1962) (optometry licensing), *aff'd,* 245 La. 1, 156 So.2d 457 (1963), *appeal dismissed,* 377 U.S. 128, 84 S.Ct. 1180, 12 L.Ed.2d 185 (1964); *State ex rel. Marshall v. Keller,* 10 Ohio St.2d 85, 226

N.E.2d 743 (1967) (adjudication by state industrial commission); *United States v. Groupp,* 333 F.Supp. 242 (D.Me.1971) (draft board), *aff'd,* 459 F.2d 178 (1st Cir.1972). We are satisfied that the de facto rule governs the present circumstance, so that the action of the Osteopathic Committee is not rendered invalid or even voidable on appeal because one of its three members did not meet the statutory qualification for length of time licensed.

Appellant relies on 1 Am.Jur.2d *Administrative Law* § 68 (1962), and two cases cited therein, to the effect that participation by one "disqualified" member of an administrative tribunal affects the action of the entire body. This authority states that the decision is *void* "if participation by a disqualified officer is prohibited by statute," and "voidable where only the common-law rule as to disqualification is violated." But a reading of the entire group of sections on "Disqualification" shows that the only defects that invoke this rule are those violating "the requirement of a disinterested and impartial tribunal," *id.* at § 63, such as bias, prejudgment, or personal or pecuniary interest. *Id.* at § 64. The stated rule is apparently an exception to the rule of de facto authority, but it is inapplicable here because this case does not involve the kind of claim that invokes it.[6]

The judgment of the district court affirming the revocation of appellant's license is affirmed.

---

**5.** An officer *de facto* is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the interests of the public and third persons, where the duties of the office were exercised,

First, without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke his action, supposing him to be the officer he assumed to be.

Second, under color of a known and valid appointment or election, but where the officer had failed to conform to some precedent requirement or condition, as to take an oath, give a bond, or the like.

Third, under color of a known election or appointment, void because the officer was not eligible, or because there was a want of

power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power, or defect being unknown to the public.

Fourth, under color of an election or appointment by or pursuant to a public unconstitutional law, before the same is adjudged to be such.

*State v. Carroll,* 38 Conn. 449, 471–72 (1871).

**6.** Even if appellant had a viable objection that a member of the Committee was unqualified or should be disqualified, that objection had to be raised in timely fashion, at the outset of the hearing, as the district court held. *Bd. of Medical Registration and Examination v. Armington,* 242 Ind. 436, 178 N.E.2d 741 (1961); *Olathe Hosp. Found., Inc. v. Extendicare, Inc.,* 539 P.2d at 13.

HALL, C.J., HOWE, J., and JAY E. BANKS, District Judge, concur.

DURHAM, J., does not participate herein.

JAY E. BANKS, District Judge, sat.

STEWART, Justice (dissenting):

The appellant was charged with "unprofessional conduct" by an osteopathic representative committee and the Department of Registration. At the time the charges were made, osteopaths were subject to U.C.A., 1953, § 58–12–18 (repealed in 1981, *see infra*). Section 18 sets out seventeen subparagraphs stating with particularity acts deemed to be "unprofessional."[1] The osteopathic representative committee charged appellant with, and found him guilty of, unprofessional conduct under another section not applicable to osteopaths, § 58–12–36. That section applies only to medical doctors.[2] *See* §§ 58–12–30, 58–12–31, 58–12–38. (The Legislature subsequently enacted new standards defining unprofessional conduct, not applicable here, to govern osteopaths and medical doctors. Section 7, ch. 27 Laws of Utah 1981, now U.C.A., 1953, § 58–12–7 (Supp.1981) (osteopaths); and Section 8, ch. 30 Laws of Utah 1981, now U.C.A., 1953, § 58–12–36 (Supp.1981) (medical doctors)). Because the committee and

1. U.C.A., 1953, § 58–12–18 (repealed 1981) provided:

The words "unprofessional conduct" as relating to the practice of medicine, or any other *system of treating human ailments, or the* practice of obstetrics, are hereby defined to include:

(1) Procuring, or aiding in or abetting, or offering or attempting to procure or aid in or abet the procuring of, a criminal abortion.

(2) Procuring any fee or recompense on the assurance that a manifestly incurable diseased condition of the mind or body can be permanently cured.

(3) Communicating without the consent of the patient information acquired in treating a patient necessary to enable one to act for such patient.

(4) Advertising, announcing or stating directly, indirectly or in substance, that the holder of any license issued under the rules and regulations of the department of registration, or that any other person, company or association by whom he is employed, will cure or attempt to cure or will treat any person or persons for lost manhood, sexual weakness or venereal diseases, or will cure *or attempt to cure or treat any disorder or* any disease of the sexual organs; or acting in the service of any person, firm, association or corporation so advertising, announcing or stating any of such things.

(5) Advertising in a way that is intended or has a tendency to deceive the public or to impose upon credulous or ignorant persons, or that may be harmful or injurious to public morals or safety.

(6) Advertising medicine or means whereby the monthly periods of women can be regulated or the menses re-established if suppressed.

(7) Habitual intemperance or excessive use of narcotics.

(8) Lending one's name to be used as a physician or surgeon by another person who is not licensed to practice in this state.

(9) Street advertising or the public peddling or selling of medical or surgical remedies or appliances in person or by proxy.

(10) Prescribing morphine or cocaine or *other narcotics, with intent that the same* shall be used otherwise than medicinally, or with intent to evade any law in relation to the sale, use or disposition of such drugs.

(11) Prescribing intoxicating liquor to be used as a beverage.

(12) Willfully violating the law in regard to the registration of births and deaths and the report of infectious diseases.

(13) Diagnosing or treating a case of venereal disease and failing to make report thereof to the health authorities in such form and manner as the state board of health shall direct.

(14) Treating venereally infected individuals and failing to fully inform such persons of the danger of transmitting the disease to others, and failing to advise against marriage by the person who has such disease in a communicable form.

(15) Advertising or professing publicly to treat human ailments under a system or *school of treatment or practice other than* that for which he holds a license.

(16) Willfully violating the rules and regulations of the department of registration governing examinations.

(17) Using fraud or deceit to secure a license to practice.

2. The majority relies on the broad standards stated in subsection (15) of § 58–12–36 which reads:

Any conduct or practice, contrary to the recognized standards of ethics of the medical profession, or any conduct or practice which does or might constitute a danger to the health, welfare or safety of the patient or the public . . . .

the Department had no statutory authority to revoke the appellant's license under § 58–12–18, and because the committee and the Department had failed to promulgate rules defining unprofessional conduct which could have provided a valid basis for revoking appellant's license, they relied upon § 58–12–36, which applies to medical doctors. Contrary to the majority's opinion, I do not believe that the parties can stipulate to adjudicate the case under statutory standards not applicable to osteopaths.

Section 58–1–25 states the grounds upon which a license of any licensee subject to the Department of Registration, including such diverse groups as barbers, cosmetologists, and physicians, may be refused, suspended, or revoked. One ground for revocation is "unprofessional conduct." However, a charge of unprofessional conduct, like other grounds for revocation under that provision must, as required by the next subsequent section, § 58–1–26, be "specific," in writing, verified and filed with the Department.

The governing statutes required that the term "unprofessional conduct" be defined by the promulgation of rules which give a licensee notice of the type of conduct for which his license could be revoked. The "representative committees" and the Department of Registration may not, as I read our statutes, revoke a license solely on a finding made in an ad hoc adjudicatory proceeding that a licensee has been guilty of some violation deemed for the first time to constitute unprofessional conduct.[3] The statutory procedure for license revocation contemplates notice of specific allegations of acts proscribed either by statute or rule.[4]

Section 58–1–13 is not, as the majority opinion seems to imply, a general authoriza-

tion to revoke a license for anything a representative committee and the Department might deem to be "unprofessional conduct." Rather, that provision simply states that a representative committee may propose rules defining unprofessional conduct to the Department which may then officially promulgate those rules. Specifically, § 58–1–13 provides that the Department, upon the written recommendation of the appropriate representative committee, shall exercise the function of "(6), *defining* unprofessional conduct, except as herein otherwise provided" (Emphasis added). That the defining of unprofessional conduct by rule is contemplated by § 13, rather than by an ad hoc adjudicatory process, follows from the language of that section itself and other statutory provisions. Section 13 is not phrased in adjudicatory terms at all. The duty of "defining unprofessional conduct" clearly contemplates the formulation of standards of unprofessional conduct by rule.

That conclusion is buttressed by § 58–1–25, which provides that the "department of registration may upon the written recommendation of the appropriate representative committee ... suspend or revoke any license" when the holder "has been guilty of unprofessional conduct." That provision, on its face, contemplates an adjudicatory proceeding based on already defined standards of unprofessional conduct. The statutory scheme contemplated that the adjudication of the "specific charges" of unprofessional conduct had to be made under standards either promulgated pursuant to § 58–1–13 or pursuant to the statutory definitions of unprofessional conduct stated in § 58–12–18.[5]

---

**3.** Existing, well recognized standards in the profession may provide sufficient normative standards. But once the osteopathic committee decided to condemn conduct beyond that condemned by the standards of unprofessional conduct stated in § 58–12–18, it was incumbent on the committee to promulgate rules adopting such standards of unprofessional conduct so that those subject to sanctions could conform their conduct to such standards.

**4.** The complexity of the subject matter to be regulated does not permit the same specificity as is required by the criminal law, of course, but it certainly permits greater specificity than the vague term "unprofessional conduct." The legal profession's code of professional conduct clearly demonstrates that reasonable specificity is possible in rules that regulate professions.

**5.** In 1981, after the hearing took place in the instant case, the Legislature revised the osteopathic licensing scheme and defined unprofes-

There is a sound reason for defining unprofessional conduct by rules, even when the rules, because of the nature of the subject matter, may have to be broad. A rule making procedure permits consideration of the viewpoints of all members of the profession, as well as the public at large. Furthermore, the formulation of standards in a rule making proceeding is likely to be done in a more disinterested atmosphere than when it is the subject of an adjudicatory proceeding.

The general statutory obligation of representative committees and the Department of Business Regulation to promulgate rules was established in *Athay v. State, Department of Business Regulations,* Utah, 626 P.2d 965 (1981):

> The legislative grant of authority to the administrative agency is necessarily in general language. It is the responsibility of the administrative body to formulate, publish and make available to concerned persons rules which are sufficiently definite and clear that persons of ordinary intelligence will be able to understand and abide by them.

*Id.* at 968. That principle applies with at least as much force in the instant case as it did in *Athay.*

In attempting to distinguish *Athay,* the majority states that: "The Court required 'uniform, published, identifiable and objective standards' . . . in apparent recognition that prospective professionals who are making large investments of time and money are entitled to specific guidance as to what is necessary for professional certification." If one who is not yet a member of a profession is entitled to that degree of protection, I am at a loss to understand why one who has been in a profession and spent many years building his livelihood not only on his professional education but also on the experience and good will built up in the practice of that profession for a number of years is not entitled to the same, if not more, protection.

The majority's implicit contention that the public is entitled to greater protection after a professional is certified rather than at the time of the certification process itself seems to create a distinction without any difference. The public's reliance upon the validity of the certification process, whether it is at the beginning of a professional career, or at some time thereafter, is exactly the same.

In dealing with such sensitive matters as state regulation of professions and vocations, the law must provide both for the protection of the public welfare as well as a person's right to due process of law before he may be deprived of practicing his chosen calling. *E.g., Schware v. Board of Bar Examiners,* 353 U.S. 232, 238, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1951); *Lewis v. District of Columbia,* D.C., App., 385 A.2d 1148 (1978). A principle central to the notion of due process of law is that a person should be given prior notice of proscribed conduct. *Lewis v. District of Columbia, supra,* at 1152. Due process, however, is not a concept so rigid that accommodation cannot be made for necessary variations which arise because of the different kinds of regulatory problems that must be addressed. A highly rigid approach that is insensitive to the complex nature of the regulatory problems involved is not constitutionally required. The regulation of professional and vocational conduct by a code as encompassing and as detailed as the Internal Revenue Code would be both stultifying to the profession or vocation and detrimental to the public. Sufficient latitude must be available to protect the public against incompetence and overreaching.

However, rules can and should be drafted which provide some guidelines more specific than the vague term "unprofessional conduct." Unless some specific meaning is infused into that term, every practitioner of a licensed profession or vocation could be placed in jeopardy for every out of the ordinary act, even though it may represent a significant and valid advancement in the calling. Such rules need not diminish the

sional conduct in even greater detail in § 58– 12–7.

public's right to be protected against new schemes and artifices.

Concededly, the courts have not been unanimous as to the degree of specificity required by statutes and rules regulating the practice of professions and vocations. However, I submit that those courts which have held that the term "unprofessional conduct" is unconstitutional as applied when there have been no limitations on the scope of that term, more fully recognize the nature of all the interests that should be recognized. *E.g., Tuma v. Board of Nursing*, 100 Ariz. 74, 593 P.2d 711 (1979); *Megdal v. Oregon State Board of Dental Examiners*, 288 Or. 293, 605 P.2d 273 (1980); *State Board of Dentistry v. Blumer*, 78 Mich.App. 679, 261 N.W.2d 186 (1977); *Lester v. Department of Professional & Occupational Regulations*, Fla.App., 348 So.2d 923 (1977). I do not believe that administrative agencies should be given such far-reaching power over a right protected by the due process clause.

In sum, I do not agree that the actions of the representative committee and the district court in this case can be justified on the statutory basis relied upon in the majority opinion, especially when the representative committee was not properly constituted and the appellant did not receive the kind of judicial review in the district court required by statute. Had the representative committee and the Department of Business Regulation promulgated rules governing unprofessional conduct for osteopaths, as contemplated by statute, the case could be remanded for further consideration under those rules. But, because appellant was found guilty of unprofessional conduct on other standards, I submit that the revocation of his license is unconstitutional.