**Richard C. HEINECKE, Petitioner,**

v.

**DEPARTMENT OF COMMERCE, DIVISION OF OCCUPATIONAL AND PROFESSIONAL LICENSING, Respondent.**

No. 890682–CA.

Court of Appeals of Utah.

April 11, 1991.

Craig S. Cook (argued), Salt Lake City, for petitioner.

R. Paul Van Dam, State Atty. Gen., and David W. Lund, Asst. Atty. Gen. (argued), Salt Lake City, for respondent.

Before BENCH, GARFF and ORME, JJ.

## OPINION

ORME, Judge:

Petitioner seeks review of the revocation of his nursing license by the Division of Occupational and Professional Licensing for having sexual relations with a troubled former patient which culminated in the patient's pregnancy. We affirm.

## FACTS

The facts set forth are based on the evidence presented at Richard C. Hei-

necke's hearing before the Utah State Board of Nursing.[1] According to the evidence, prior to the revocation of his nursing license, Heinecke was a registered nurse with approximately fifteen years experience. From September 17, 1987, until April 15, 1988, Heinecke worked as a nurse in the psychiatric unit at Pioneer Valley Hospital.

On March 2, 1988, while working at Pioneer Valley Hospital, Heinecke was assigned to care for a psychiatric patient, referred to in these proceedings as Jane Doe. Jane was diagnosed with multiple personality disorder, resulting from, or exacerbated by, a long history of sexual abuse, possibly including ritualistic abuse. At the time of her admission, Jane was also suffering from depression and was considered potentially suicidal. In addition to Jane's other diagnosed problems, her psychiatrist and therapists were apparently concerned there might be some substance to Jane's claim that she had been involved with a satanic cult, whose members were allegedly desirous that she return to the fold. Consequently, Jane's therapists thought that in addition to the opportunity for full-time observation and treatment, hospitalization might also provide her some measure of security and protection against the alleged cult.

Nurse Heinecke took great interest in Jane's care from the outset. He noticed that some of the other nurses were intimidated by Jane's background and condition. He was convinced, however, that she required special attention. Consequently, Heinecke spent a great deal of time with Jane. Despite the fact that she had gotten married just two weeks earlier, Jane was very receptive to Heinecke's interest, and it was not long before she was calling him at home, when he was off-duty, just to talk or to ask him to visit her.

Heinecke often responded and spent a significant amount of his free time with Jane at the hospital. He soon learned how

1. Although the facts giving rise to administrative review of the petitioner's nursing license involved two separate incidents with two separate patients, the first incident provides suffi-

cient basis on which to affirm the board, and we limit our review and the scope of our opinion accordingly.

to "access" and communicate with some of Jane's personalities.[2] Jane became quite attached to Heinecke and often became agitated when he was not with her. Sometimes Jane became so difficult in Heinecke's absence that he was contacted at home and asked to come in while he was off-duty to help calm Jane down.

As a result of the extraordinary amount of attention Heinecke paid to Jane, in mid-March hospital nursing administrators cautioned Heinecke that he was spending too much time with Jane, at the expense of his other patients, and she was becoming too dependent on him. Jane's therapists also warned that Heinecke's excessive involvement was interfering with Jane's progress. Heinecke failed to heed these warnings, however, and sometimes neglected his other duties in order to spend more time with Jane. Consequently, on April 14, hospital nursing administrators ordered Heinecke to stop seeing and working with Jane.

Heinecke responded by requesting an immediate leave of absence from the hospital. When Jane learned that Heinecke would no longer be working with her, she became extremely upset and immediately demanded to be discharged from the hospital.

Some members of the hospital staff were still concerned about protecting Jane from the alleged cult. Because Heinecke shared that concern and did not believe Jane could protect or care for herself while her husband was away, he picked her up at the hospital on April 15, and took her to his own apartment, where he explained to his wife and children why Jane needed to stay with them and be under his personal care. Jane's husband joined her at Heinecke's apartment, and agreed that Jane could not be left alone. Consequently, both Jane and her new husband stayed at the Heinecke family apartment for several days, until Heinecke's own marriage fell apart, and he decided that he would have to move out as well.

Because of Jane's situation and the fact that she, her husband, and Heinecke all were in the market for a new housing arrangement, they decided to find an apartment together. Jane and her husband could not afford to pay Heinecke to care for Jane. But because they all agreed that she could not be left alone, Heinecke agreed to stay with Jane and care for her during the day while her husband was at work. Heinecke, in turn, worked at a hospital emergency room at night while Jane's husband was able to be at home with her.

Heinecke lived with Jane and her husband from April 15 until July 15. During that time he acted as Jane's protector and friend, by his own characterization, with some dispute as to whether he also acted as a nurse. Although his devotion to Jane was admittedly extraordinary, except for one overwhelming weakness Heinecke may have seemed like a very unselfish, caring, compassionate nurse who made personal sacrifices to help Jane through her afflictions.[3]

Because of Jane's psychological disorders, her therapist had told both Jane and her husband that they should exercise birth control and take careful precautions to prevent Jane from becoming pregnant. The therapist explained that a pregnancy and subsequent birth of a baby would seriously impede Jane's progress and aggravate her precarious psychological condition. Moreover, because Jane was suffering from an ulcerated urethra and was taking medication for that condition, her physician told her not to engage in sexual intercourse at all. Consequently, despite their newly-wedded status, because of Jane's condition—both mentally and physically—her husband was practicing sexual abstinence.

Heinecke and Jane, however, were not practicing sexual abstinence. One or more of Jane's personalities, we are told, prompted her to become Heinecke's lover. While Jane's husband was away during the day, Heinecke was accessing the amenable personalities and having sex with Jane.

---

**2.** Refraining from editorial comment, we note she was diagnosed as having forty-six different personalities.

**3.** After all, Heinecke put his own nursing career on hold to care for Jane.

According to Jane's testimony, her "core personality" did not become aware of Heinecke's sexual relationship with one or more of her other personalities until July 14, when her core personality realized that one of her other personalities was having sexual intercourse with Heinecke. Shortly thereafter Jane contacted, and revealed this discovery to, her therapist. Jane's therapist then accessed the other personality, who supposedly told the therapist it had been having an affair with Heinecke.

After this revelation, Jane's therapist triggered what we are told was a rare communication between Jane's core personality and a personality that was sexually involved with Heinecke. This communication revealed that Heinecke had been having sex with one or more of Jane's other personalities three to six times a week for several months. After realizing what was happening, and upon her therapist's advice, Jane and her husband immediately moved out of the apartment they shared with Heinecke. Although it is not certain exactly when Jane started having sex with Heinecke, she became pregnant with his child on or about April 15, 1988.[4]

After learning of Heinecke's actions, Jane's therapist initiated a complaint against him with the Division of Occupational and Professional Licensing. In a disciplinary hearing before the Utah State Board of Nursing, Heinecke admitted his sexual relationship with Jane. He claimed, however, that he loved her and wanted to marry her. Although Heinecke denied, and the Nursing Board did not expressly find, that he engaged in sexual intercourse with Jane while she was hospitalized at Pioneer Valley Hospital, the evidence regarding when she became pregnant may indicate otherwise.[5] In any event, unmoved by Heinecke's claim of purely romantic motives, and comparatively unconcerned with when

his sexual relationship with Jane began, the Division revoked Heinecke's nursing license for unprofessional conduct upon the Nursing Board's recommendation.

Heinecke's appeal of the Division's action raises three issues: (1) Were the Division's findings supported by substantial evidence? (2) Did Heinecke have adequate advance notice that his actions might constitute unprofessional conduct, so as to satisfy due process requirements? (3) Were Heinecke's actions within the scope of the Division's disciplinary authority?

Before addressing the substantive issues, however, we turn first to the state's procedural claim, belatedly made for the first time at oral argument, that because Heinecke failed to exhaust his administrative remedies this court lacks jurisdiction to review the Division's decision.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

Although this issue was not briefed on appeal, during oral argument counsel for the Division questioned whether Heinecke had exhausted his administrative remedies as required under the Utah Administrative Procedures Act ("UAPA") since he did not seek review of the Division's determination by the head of the Department of Commerce. See Utah Code Ann. § 63-46b-14 (1989).

To support this argument, counsel alluded to *Hi–Country Homeowners v. Public Serv. Comm'n*, 779 P.2d 682 (Utah 1989), in which the Utah Supreme Court held that petitioners before the Public Service Commission ("PSC") are statutorily required to seek review or rehearing by the PSC before they may secure judicial review in the Supreme Court. See *id.* at 684–85. The Court found that Utah Code Ann. § 54-7-15 (1990) imposes a jurisdictional

---

**4.** Heinecke never denied his sexual involvement with Jane or that he is the biological father of her child.

**5.** At Heinecke's administrative hearing before the Nursing Board, evidence was introduced that Jane's fertilized ovum became implanted on April 20, 1988. This meant that conception must have occurred 10 to 14 days earlier. To

rebut this evidence Heinecke called an obstetrical gynecologist to testify that in his opinion Jane probably became impregnated after her discharge from the hospital on April 15, rather than before. Jane's baby was born prematurely, however, on December 5, 1988, after a 35-week gestation period.

prerequisite to judicial review of the PSC's actions, and held that "failure to apply for rehearing within twenty days of the Commission's issuance of its order divests [the Supreme Court] of subject matter jurisdiction." *Id.* at 684. The case before us, however, is subject to no such jurisdictional prerequisite.

Although we do not wish to make any broad, sweeping generalization on this issue in the absence of proper briefing, based on our own independent research we conclude that section 54–7–15 does not apply to this case; it applies only to administrative claims before the PSC. Judicial review of administrative actions taken by the Division of Occupational and Professional Licensing are governed by Utah Code Ann. §§ 58–1–1 to –21 (1990). The sections governing the Division contain no specific jurisdictional prerequisite to judicial review of agency action; they simply require that all adjudicative proceedings before the Division or any of its subsidiary boards must comply with the procedures and requirements of UAPA. *See* Utah Code Ann. §§ 58–1–3.5, –8.5, –16 (1990).

Section 16 of UAPA provides that "the Supreme Court or the Court of Appeals has jurisdiction to review all final agency action resulting from formal adjudicative proceedings." Utah Code Ann. § 63–46b–16 (1989). Administrative remedies must ordinarily be exhausted before agency action will be considered final. *See* Utah Code Ann. § 63–46b–14 (1989). However, section 12 provides that

> [i]f a statute or the agency's rules *permit* parties to any adjudicative proceeding to seek review of an order by the agency or by a superior agency, the aggrieved party *may* file a written request for review within 30 days after the issuance of the order with the person or entity designated for that purpose by the statute or rule.

Utah Code Ann. § 63–46b–12(1)(a) (1989) (emphasis added). *See also* Utah Code Ann. § 63–46b–12(3) (1989) (review by superior agency may also be required by statute).

Unlike the statutory provisions governing the PSC, which *require* parties to apply for review or rehearing by the PSC before seeking judicial review, *see* Utah Code Ann. § 54–7–15 (1990), the appeals procedure governing the Division is nothing more nor less than what is specified in UAPA; no provision in the statutes governing the Division appears to provide for review beyond the Division level as contemplated in section 12(1)(a) of UAPA, which review would in any case be optional so as not to defeat finality for purposes of judicial review given the "permit" and "may" usages in the section, nor is any mandatory review provided for as contemplated in section 12(3).

Moreover, the statutory provisions governing the Department of Commerce, of which the Division is an organizational component, do not suggest that departmental review is a mandatory prerequisite to judicial review of Division action. *See* Utah Code Ann. §§ 13–1–1 to –13 (1986 & Supp.1990). Section 13–1–12 simply provides that after an administrative law judge, occupational board, or representative committee issues an order, "[t]he order *may* be appealed to the executive director or the division director for review." *Id.* (Supp.1990) (emphasis added). Only "[i]f a division director is unable for any reason to fairly review or rule upon an order of the administrative law judge or a board or committee," is the executive director obligated to "review and rule upon the order." *Id.*

This procedure appears to have been followed in this case since the Division acted on the Nursing Board's recommendation in revoking Heinecke's license. The Division adopted the findings of fact and conclusions of law of the administrative law judge presiding at Heinecke's hearing before the Nursing Board. The Division issued an order adopting those findings and conclusions on October 25, 1989. It is from that final order that Heinecke petitioned for judicial review, having foregone his optional appeal to the Department's executive director.

Neither in a motion for summary disposition nor even in briefing did the Division claim further administrative review was required. Based on our conclusion that Hei-

necke exhausted his required administrative remedies, we conclude for purposes of this case that we have jurisdiction to review this matter pursuant to Utah Code Ann. §§ 63–46b–16 (1989) and 78–2a–3(2)(a) (1987).[6]

## SUBSTANTIAL EVIDENTIARY SUPPORT FOR BOARD'S FINDINGS

■ Heinecke argues adamantly, and at great length, that the Division's findings generally are not supported by substantial evidence. He fails, however, to point out exactly which findings are unsupported by substantial evidence, and how the evidence is insufficient. To successfully challenge such findings on judicial review of administrative action, a party must demonstrate that the findings are "not supported by substantial evidence when viewed in light of the whole record before the court." Utah Code Ann. § 63–46b–16(4)(g)(1989); *Grace Drilling v. Board of Review,* 776 P.2d 63, 67–68 (Utah Ct.App.1989). In order to do this, a party must marshal the evidence, *Grace Drilling,* 776 P.2d at 68, i.e., it "must marshal the evidence *in support* of the findings and then demonstrate that despite this evidence, the ... findings are so lacking in support" as to be inadequate under the applicable standard of review.[7] *Mountain States Broadcasting Co. v. Neale,* 783 P.2d 551, 553 (Utah Ct. App.1989) (citations omitted).

While many appellants completely "overlook or disregard this heavy burden," *see*

*id.,* Heinecke did not disregard the obligation entirely, but he did misperceive it. Instead of marshalling only the evidence *supporting* the Division's findings, Heinecke reviewed in minute detail all the evidence before the Nursing Board.[8] Moreover, Heinecke insisted on emphasizing the evidence that supported his position, and left it to the court to sort out what evidence actually supported the findings. Like the appellant in *Horton v. Gem State Mut. of Utah,* 794 P.2d 847 (Utah Ct.App. 1990), Heinecke failed to completely satisfy his obligation to marshal the evidence by "persistently arguing [his] own position without regard for the evidence supporting the [Division's] findings." *Id.* at 849.

For purposes of our review, however, the facts we view as critical are not only supported by substantial evidence, they are essentially undisputed: (1) As a licensed nurse, Heinecke cared for Jane Doe at Pioneer Valley Hospital; (2) Jane suffered from serious psychological disorders; (3) through the course and scope of his employment as a nurse, Heinecke learned how to access and manipulate Jane's various personalities; (4) following her release from the hospital, if not sooner, Heinecke engaged in sexual relations with Jane upon successfully accessing one or more of her multiple personalities.

## DUE PROCESS

■ While we are not without some opinion on the matter, it is not the function of

---

6. We do not foreclose fresh consideration of this issue in some future case where the argument is timely raised and properly briefed.

7. While it is true, as recognized in *Grace Drilling,* that there is a distinction between the "substantial evidence viewed in light of the whole record" test, and other less exacting standards of appellate review, *see* 776 P.2d at 67–68, this distinction does not obviate the need to *marshal* the evidence. *Id.* at 68. Although the marshalling requirement has been most ardently adhered to in cases applying a "clearly erroneous" standard, *see, e.g., Mountain States Broadcasting Co. v. Neale,* 783 P.2d 551, 553 (Utah Ct.App. 1989); *Horton v. Gem State Mut. of Utah,* 794 P.2d 847, 849 (Utah Ct.App.1990), the marshalling requirement is equally applicable under the substantial evidence test. *See Grace Drilling,* 776 P.2d at 68; *Adams v. Board of Review,* 776

P.2d 639, 641 (Utah Ct.App.1989). The only difference is that, once the supporting evidence has been properly marshalled, a decision of whether the supporting evidence is enough to sustain the findings is less deferential under substantial evidence analysis, i.e., both conflicting and supporting evidence is considered in evaluating the adequacy of support for the findings. *Grace Drilling,* 776 P.2d at 68 & n. 7.

8. Evidence *contrary* to the findings becomes relevant when the court scrutinizes the supporting evidence under the "substantial evidence viewed in light of the whole record" test, *see* note 7, *supra,* but this is a distinct and subsequent analytic step. *See Grace Drilling,* 776 P.2d at 68 & n. 7. Contrary evidence should therefore be referred to in briefing only after the supporting evidence has been separately marshalled.

this court to judge the professional qualifications or practices of the petitioner. *See Vance v. Fordham*, 671 P.2d 124, 126 (Utah 1983). "Our function is limited to assuring the legality of and compliance with the process the law has established to regulate the professions in the public interest." *Id.* In this case, we must decide whether due process requirements were satisfied. We must determine whether or not the statutes and rules governing the nursing profession provided Heinecke with adequate notice that his conduct with Jane might be considered "unprofessional."

Heinecke claims that because he had no advance notice that his sexual relationship with Jane might constitute "unprofessional conduct" for which his nursing license could be revoked, he was deprived of his license, and livelihood, without due process of law. He argues that nothing in the Nurse Practice Act, nor the administrative rules governing the conduct of nurses, specifically prohibits nurses from having consensual sexual relations with past, or even present, patients. Heinecke suggests that, in this day and age, consensual sexual relationships occur between professionals and their patients or clients on a fairly routine basis.[9] Therefore, such behavior, although not necessarily commendable, is unexcep-

tional. Because the boundaries of "unprofessional conduct" are so vaguely defined, Heinecke argues that he had *no reason to* believe that what he considered to be unexceptional private conduct might subject him to professional discipline under the rubric of unprofessional behavior.

Contrary to Heinecke's arguments, there is no due process violation in this case. As they apply in this case, the statutes and rules governing the nursing profession provided Heinecke with adequate notice of the standards of the nursing profession. The Division of Occupational and Professional Licensing is authorized to revoke any professional's license for unprofessional conduct. Utah Code Ann. § 58-1-15(1) (1990). The Nursing Board is specifically authorized to recommend that a nurse's license be revoked or suspended if the nurse "is guilty of immoral, unethical, or unprofessional conduct as it relates to the practice of nursing." Utah Code Ann. § 58-31-14(1)(b) (1990).[10]

"Unprofessional conduct as it relates to the practice of nursing" is admittedly a broadly phrased standard, one which may not have a ready and precise meaning to those outside the profession.[11] Such a general statutory standard is acceptable, how-

---

**9.** Frankly, we think someone may have been watching too much "L.A. Law" and "General Hospital." We believe, and certainly hope, that the incidence of professionals engaging in sexual relations with their patients or clients is not as widespread as Heinecke would have us believe. While the concern may be reduced in the case of professionals like architects and engineers, who deal more with "things" than people, professionals entrusted with the psyche of their client or patient, whether the domestic relations attorney or the mental health nurse, simply have no occasion, *as professionals*, to mess around with those whose care has been entrusted to them, especially during periods of actual or potential vulnerability.

**10.** The grounds for which the Nursing Board may recommend that a nurse's license be revoked are described in Utah Code Ann. § 58-31-14(1) (1990):

(1) The board may recommend to the division the revocation or suspension of any license to practice nursing. The division has the power to revoke or suspend any license to practice nursing or to deny any license applied for in accordance with provisions of this chapter, if the person:

(a) is guilty of fraud or deceit in procuring or attempting to procure a license to practice nursing;

(b) *is guilty of immoral, unethical, or unprofessional conduct as it relates to the practice of nursing;*

(c) is unfit or incompetent by reason of negligence, habits such as habitual intemperance or addiction to habit-forming drugs or other causes;

(d) has negligently or willfully acted in a manner inconsistent with the health or safety of patients under the licensee's care;

(e) has been declared mentally incompetent;

(f) has willfully violated this chapter.

*Id.* (emphasis added).

**11.** We acknowledge that such a generally phrased standard may be problematic in the context of conduct that conscientious members of a profession would not, with consensus, perceive to be "unprofessional." Such cases can arise where an individual's conduct is so far removed from the crux of the business of the profession that it is only peripherally related. But the more clearly "unprofessional" conduct is, the less problematic a general standard is

ever, for three reasons: "(1) The subject of professional performance is too comprehensive to be codified in detail. (2) Members of a profession can properly be held to understand its standards of performance. (3) Standards of performance will be interpreted by members of the same profession in the process of administrative adjudication." *Vance v. Fordham*, 671 P.2d 124, 129 (Utah 1983). Moreover, the vagueness objections applicable to penal laws do not apply to the revocation of professional licenses. *Id.* at 128. In contrast to the unfairness in imposing criminal liability on a run-of-the-mill citizen under a statute which does not clearly proscribe the conduct complained of, as a result of their training, testing, and licensure, members of a profession are properly charged with knowledge of what conduct is inconsistent with their responsibilities as professionals notwithstanding some lack of precision or comprehensiveness in the statutes and rules governing their licensure.

Although the Utah Administrative Code contains a nonexclusive list of twenty-six specific items that constitute unprofessional nursing conduct, *see* Utah Admin. Code R153–31–6(D), as a general proposition, "[any behavior related to the practice of nursing] which ... could jeopardize the health and welfare of the people [constitutes] unprofessional conduct...." Rules Governing Conduct of Nurses, Utah Admin. Code R153–31–6(D) (1990). This language provided Heinecke with adequate notice that he should not do anything that could jeopardize the health or welfare of Jane Doe. He cannot argue with a straight face that his conduct did not jeopardize her health and welfare.[12]

Because of Jane's physical condition, an ulcerated urethra, she had been admonished to abstain from sexual intercourse. Because of her psychological disorders, Jane had been strongly admonished to

---

*when applied by members of the same profession* to that conduct; the more peripheral conduct is, the less fair it becomes to reach it in disciplinary proceedings under a broad, general standard.

For an uninitiated member of the general public, the question of how far removed conduct can be from the crux of the nursing profession and still be considered unprofessional may be unclear. To nurses, however, the question is more clear. For precisely that reason, the Legislature has wisely delegated regulatory oversight of the nursing profession to the state Nursing Board. *See* Utah Code Ann. §§ 58–31–3, –14 (1990). Because of their training, experience, and understanding of professional standards, nurses are presumed to know better than others what is expected of them. We doubt there would be any question in any conscientious nurse's mind that to care for and instill trust and confidence in a vulnerable psychiatric patient, then, without any clear termination of the nurse/patient relationship, engage in a sexual relationship with the patient, is unprofessional.

Of course, the kind of behavior that will be considered unprofessional conduct varies from profession to profession. What the nurse in this case did is not in a gray area for members of the nursing profession. Another profession might view sexual conduct differently. A real estate agent, for example, who has consensual sex with a client to celebrate a successful closing may well be in a grayer area of professional conduct, because of the relative remoteness of the conduct from the crux of the profession's business. By the same token, the situation would be much less gray if the buyer's real

estate agent, anxious to see a threatened deal go through and thereby a large commission earned, got the buyer to waive a condition in an earnest money agreement, which condition was necessary to protect the buyer's best interest, in exchange for sexual favors.

12. There may well be cases involving less egregious conduct where a nurse might legitimately argue, on due process grounds, that even with the definitional rules, the "unprofessional conduct" standard is so vague and ambiguous that it does not provide adequate advance notice that certain conduct will be considered unprofessional. Such cases might involve conduct which does not fall within any of the nursing rules' 26 specific categories of unprofessional conduct, and does not jeopardize the health or welfare of other specifically identifiable individuals, even though it is somehow arguably related to the practice of nursing. Due process concerns might at least become viable in the context of nurses sought to be sanctioned for cheating on taxes involving income earned in the practice of nursing or shoplifting while on lunch break from nursing work. *See, e.g., Tuma v. Board of Nursing*, 100 Idaho 74, 593 P.2d 711 (1979) (reversing "unprofessional conduct" license revocation resulting from nurse's discussion with patient concerning alternative treatment methods not disclosed by treating physician); *Megdal v. Oregon State Bd. of Dental Examiners*, 288 Or. 293, 605 P.2d 273 (1980) (reversing "unprofessional conduct" license revocation resulting from dentist's misrepresentations to malpractice insurance carriers).

practice birth control. Heinecke knew that having any kind of sexual relationship with Jane, let alone repeated, unprotected intercourse, could aggravate her condition and impede her therapeutic progress. Heinecke ignored better professional judgment, however, and exploited Jane's condition.

The articulated standards of the nursing profession, necessarily general though they are, provided Heinecke with adequate notice that his conduct would be considered "unprofessional." As a nurse, he should have known that his actions would jeopardize Jane Doe's health or welfare. Those actions were therefore unprofessional under any conceivable standard of nursing professionalism.[13] Consequently, we find no due process violation.

## SCOPE OF NURSING BOARD'S DISCIPLINARY AUTHORITY

█ Finally, Heinecke argues that even if due process requirements were satisfied, his actions did not fall within the scope of the Nursing Board's disciplinary authority as provided by statute. Although he admits to his sexual relationship with Jane, Heinecke maintains that because it did not occur while he was caring for her as a patient in his capacity as an employed nurse, the Nursing Board has no jurisdiction over his actions.

Heinecke maintains that the nurse/patient relationship clearly ended before the sexual relationship began. To support this theory, Heinecke maintains that the sexual relationship did not begin until after Jane was discharged from the

hospital. Moreover, Heinecke insists that after Jane was discharged from the hospital he did not act in the capacity of nurse; he acted only as a friend and protector. He claims that his motives were pure, and he acted only out of love and compassion for Jane. Consequently, because he offered his services only as a friend and received no monetary compensation for his services, Heinecke claims his actions were exempt from the rules and regulations governing nurses generally. *See* Utah Code Ann. § 58–31–15 (1990).

We find Heinecke's arguments untenable. Regardless of how pure his original intentions might have been, the Nursing Board found that Heinecke's ultimate actions crossed the line into the realm of unprofessional conduct for a nurse. The direct link that Heinecke believes must exist between the charged conduct and "official" nursing activity simply does not exist as a matter of statute. The Nursing Board is authorized to recommend suspension or revocation of a nurse's license for any "immoral, unethical, or unprofessional conduct *as it relates to the practice of nursing.*" Utah Code Ann. § 58–31–14(1)(b) (1990) (emphasis added). Although Heinecke's improper actions may not have occurred directly within the scope of his employment as a nurse at Pioneer Valley Hospital, we accept the Nursing Board's conclusion that Heinecke's specific immoral and unprofessional conduct was sufficiently related to the practice of nursing.[14] If Heinecke had been satisfied to simply care for Jane as a friend and protector, as was his claim, this case would have never come before the

---

**13.** A profession is a calling which requires specialized *knowledge, training, and commitment,* maintained by high standards of achievement and conduct, enforced by its own members who commit themselves to "continued study and to a kind of work which has for its prime purpose the rendering of a public service." *Webster's New International Dictionary* 1811 (3d ed. 1986).

**14.** One of the hallmarks of a profession is that a member's *professional responsibilities extend* beyond the scope of his or her immediate employment. Just because a doctor, for example, is returning from a weekend fishing trip on personal time, the doctor's professional obligation to render emergency aid to an accident victim is not excused. Likewise, the professional obligation of attorneys and psychologists to

protect the confidential communications of their clients extends well beyond the termination of the professional's engagement.

In short, just because a professional is "off-duty" does not mean that his or her conduct is completely insulated from professional concern. Consequently, we do not subscribe to the view that the Nursing Board's interest was limited to Heinecke's on-duty behavior, even as a general proposition, and particularly is this so where he took advantage of knowledge and information gained while on-duty to exploit an unprofessional "off-duty" relationship.

In saying this, we do not intend to convey the impression that all professionals must take a monk-like vow of chastity, or consider themselves under continuous, nonstop professional

Nursing Board. His actions, however, went well beyond the bounds of compassionate service.

Heinecke's conduct, though much worse, is similar to the conduct at issue in *D.B. v. Division of Occupational & Professional Licensing*, 779 P.2d 1145 (Utah Ct.App. 1989). In *D.B.*, a social worker was assigned to work with a woman who was suffering from emotional problems stemming from sexual molestation as a child. D.B., the social worker in question, met with the woman on a biweekly basis for over a year. For several months after the professional relationship ended, D.B. met the woman on a personal basis. D.B. admitted that during these subsequent meetings they engaged in hugging, kissing, and "fondling" of sexual organs, but denied ever engaging in sexual intercourse. Based on the recommendation of the Board of Social Work Examiners, the Division of Occupational and Professional Licensing revoked D.B.'s license to practice social work for unprofessional conduct, despite the fact that the conduct complained of occurred after termination of the professional relationship. *See id.* at 1147. Although this court reversed the revocation based on a legitimate constitutional claim resulting from a procedural error, we found that absent the procedural flaw, D.B.'s substantive actions "may have established 'unprofessional conduct' ... [and thus] constitute a basis upon which the Division could justify revocation of [his] license." *Id.* at 1148.

Similar to D.B.'s situation, Heinecke met Jane in the course and scope of his employment as a nurse at Pioneer Valley Hospital. Although Heinecke may have thought he was no longer acting as a nurse after Jane was discharged from the hospital, it is not clear that Jane felt the same way. She testified that his care for her at home was substantially the same as it had been at the hospital, and she thought that although she

had come to consider Heinecke a friend, he was still acting as her personal nurse, albeit without monetary compensation. Heinecke may have thought the professional nurse/patient relationship ended when he ceased receiving more typical compensation for his services, but clearly it was not erroneous for the Nursing Board to find that in any event his actions were *related* to the practice of nursing.

It was through his employment as a nurse that Heinecke met Jane. Through the course of his employment, Heinecke also learned of Jane's vulnerabilities, and how to bring out, and communicate with, her various personalities. Finally, it was in the course of Heinecke's care of Jane as a nurse that he developed such a unique relationship and rapport with her. She placed complete confidence and trust in him.

Heinecke betrayed that trust by exploiting Jane's condition. He employed the knowledge he gained while employed as a nurse to access and manipulate her personalities. Heinecke then preyed on Jane's vulnerability for his own purposes, romantic and well-intentioned though he may have thought them to be. The Nursing Board found that Heinecke's actions were related to the practice of nursing. Clearly, in the absence of error—and we see none here—we would be remiss if we were to substitute our judgment for that of the professional panel charged with internal professional disciplinary and licensing recommendations concerning professional peers engaged in such a sensitive area of human service.

The Division's order is entirely appropriate and is affirmed.

GARFF and BENCH, JJ., concur.

---

scrutiny. Nurses, like other professionals, are of course entitled to a private life. The instant case is, as conceded by Heinecke's counsel at oral argument, altogether unlike one where a competent adult patient who is "available" comes to a doctor's office or emergency room for treatment of a bee sting; the patient meets a nurse; they hit it off; the patient asks for the nurse's phone number; they get together later for pizza and a movie; and in due course, during the nurse's off-duty hours and in an appropriate location, the sparks fly. Such an encounter would be considered quite unrelated to the practice of nursing, and therefore be beyond the scope of the Nursing Board's professional scrutiny under the present regulatory scheme.