STATE of Utah, Plaintiff and Appellee,

v.

Ralph Leroy MENZIES, Defendant and Appellant.

No. 880161.

Supreme Court of Utah.

March 11, 1992.

R. Paul Van Dam, Charlene Barlow, Salt Lake City, for plaintiff and appellee.

Brooke C. Wells, Joan C. Watt, Richard G. Uday, Salt Lake City, for defendant and appellant.

HALL, Chief Justice:

Ralph Leroy Menzies appeals from the denial of his motion for a new trial. We affirm. The issue on appeal is whether the trial court abused its discretion in ruling that the record is sufficient for appellate review.

On March 8, 1988, after a jury trial, Menzies was convicted of first degree murder,[1] a capital offense, and aggravated kidnaping,[2] a first degree felony. He waived the right to a jury for the penalty phase of the proceedings, and the trial court sentenced him to death. On May 26, 1988, he filed a docketing statement in this court, raising twenty-nine issues on appeal. The trial transcript was certified on September 5, 1988. In preparing his brief, Menzies observed that the record contained numerous transcription errors. On November 15, 1989, prior to submitting his brief, Menzies filed a "motion to set aside judgment and/or for a new trial" on the ground that transcription errors rendered the record inadequate for appeal. The trial court referred the matter to this court, and Menzies modified his motion to include claims concerning the qualifications of the court reporter.

We remanded the case to the trial court to conduct proceedings to correct the record, pursuant to rule 11(h) of the Rules of the Utah Supreme Court.[3] We also direct-ed the trial court to rule on Menzies' motion for a new trial and to resolve all issues relating to the qualifications of the court reporter and the adequacy of the transcript.

On remand, several hearings were held in the trial court. It was established at these hearings that the court reporter, Ms. Tauni Lee, was not licensed in the state of Utah. However, evidence was presented that Lee attended Empire Business College in Santa Rosa, California, where she completed a twenty-month course in court reporting. In 1985, Lee passed the California certified shorthand reporter examination. She tested at a speed of 200 words per minute and received an overall score of 97 percent. From August 1985 through July 1987, she worked as a certified court reporter in municipal court in Sonoma County and in municipal and superior court in Marin County. During her tenure in California, Lee completed several transcripts that were used for appeals.

In July 1987, Lee moved to Utah. She stopped paying her California dues because she believed it was no longer necessary to retain her California certification. By reason of nonpayment of dues, her California certification lapsed. Lee, thinking that a national certification was all that was needed to work in Utah, applied for certification from the National Shorthand Reporters Association ("NSRA"). On the basis of her California test scores, Lee obtained a national certification and began paying dues to the NSRA.

In January 1988, Lee was appointed court reporter in the Third Judicial District Court. The administrative office of the courts was aware that Lee was not licensed in Utah. However, on the basis of her qualifications and because she was the only applicant, the office determined that Lee could hold the position until June 1988, when the next Utah examination for certified reporters was scheduled. This determination was based on Utah Code Ann. § 78–56–17, which provides for the appoint-

---

1. *See* Utah Code Ann. § 76–5–202.

2. *See* Utah Code Ann. § 76–5–302.

3. R.Utah S.Ct. 11(h) (1988). In 1990, the Rules of the Utah Supreme Court were amended.

Similar procedures can presently be found in Utah Rule of Appellate Procedure 11(h).

ment of unlicensed court reporters on a temporary basis.[4] Lee reported Menzies' trial in February and March 1988.

In preparing the transcript of Menzies' trial, Lee used a note reader and a proofreader. The note reader would transcribe Lee's shorthand notes and mark any portions of the transcript where she had difficulty reading the notes. Lee would then proofread the portions of the transcript that were marked. The proofreader read over the rest of the transcripts, looking for misspellings and similar errors. It was established in the hearings that certified reporters use note readers in preparing transcripts, and Lee's note reader was considered "excellent." However, it was common practice for the court reporter to proofread all the work prepared by a note reader.

In November 1990, the trial court denied Menzies' motion for a new trial based on Lee's licensure status. The court ruled that Lee was "de facto" qualified because of her "training, testing, and experience." The court also ruled that for a new trial to be granted on the basis of transcription errors, Menzies must show that the errors are uncorrectable and prejudicial. After this ruling, the parties continued in their attempts to correct the record.

As part of the procedures to correct the record, Lee read from her shorthand notes while representatives of both parties read from a copy of the original transcript. Discrepancies between the original version and Lee's notes were noted on this copy of the transcript. Because the process was conducted in California, this copy of the transcript is referred to as the "California version." In addition to the proofreading of the original transcript, several motions and stipulations were filed in an attempt to correct the record. However, in many instances, the parties were unable to agree on what had occurred at trial, and there-

fore, the record could not be corrected through the procedures of rule 11(h).

Proceedings were also conducted to determine if the errors that existed in the record warrant a new trial. It was established that the trial judge, a member of the prosecutor's staff, and two lawyers representing Menzies had read the transcript from cover to cover. After this extensive review, the trial court concluded that none of the transcription errors were prejudicial. On February 20, 1991, the trial court issued its final ruling, denying Menzies' motion for a new trial on the ground that "the transcript is sufficiently accurate to afford defendant a full and fair review of his issues on appeal." The court also designated the California version of the transcript, as well as the original version of the transcript, as part of the record on appeal.

In the instant appeal, we review only issues concerning the adequacy of the transcript. We do not reach the merits of the conviction and sentence.

## I. STANDARD OF REVIEW

■ The decision to grant a new trial pursuant to Utah Rule of Criminal Procedure 24 is a matter within the discretion of the trial court. Accordingly, we will not reverse a ruling denying a new trial "absent a clear abuse of that discretion."[5] Generally, we will not find abuse of discretion unless, given the applicable facts and law, the trial court's decision is unreasonable.[6] Indeed, granting the trial court deference is appropriate. The judge who presided over the trial is in a far better position to determine whether the record adequately reflects the proceedings.

■ We also note that in appeals from trials where a sentence of death is imposed, the scope of appellate review is expanded. "This Court will review errors raised and briefed on appeal in death penalty cases, even though no proper objection was made

4. See infra note 27 and accompanying text.

5. State v. Williams, 712 P.2d 220, 222 (Utah 1985); see also State v. James, 819 P.2d 781, 793 (Utah 1991); State v. Weaver, 78 Utah 555, 6 P.2d 167, 169 (1931); State v. Mellor, 73 Utah 104, 272 P. 635, 639 (1928).

6. See Crookston v. Fire Ins. Exch., 817 P.2d 789, 805 n. 19 (Utah 1991); Huston v. Lewis, 818 P.2d 531, 534 (Utah 1991); State v. Petersen, 810 P.2d 421, 424 (Utah 1991); State v. Ramirez, 817 P.2d 774, 781–82 n. 3 (Utah 1991).

at trial, but will reverse a conviction based upon such errors only if they meet the manifest and prejudicial error standard." [7] In addition, we have the prerogative to notice plain errors that are apparent on the face of the record even if the appellant does not complain of the error on appeal.[8] To be considered plain or manifest error, an error must be both harmful and obvious.[9]

## II. QUALIFICATIONS OF THE COURT REPORTER

■ At the trial level, Menzies argued that because Lee was not licensed in Utah, the transcript she prepared could not be used on appeal. The trial court rejected this argument, ruling that Lee's licensure status did not affect the validity of the transcript because Lee was "de facto" qualified. On appeal, Menzies claims that this ruling constitutes abuse of discretion.

Menzies' argument is based on Utah Code Ann. § 78–56–15,[10] which provides that "no person may be appointed to the position of shorthand reporter nor act in that capacity ... unless he has received a certificate from the Division of Occupational and Professional Licensing," and on Utah Code Ann. § 76–3–206(2) and Utah Rule of Criminal Procedure 26(10), which provide for mandatory review of the "entire record" in every case in which a sentence of death is imposed. Menzies asserts that these statutes and rule 26(10) implicitly provide that only a transcript prepared by a certified reporter may be used to review a capital case. In the alternative, he argues that even if the transcript can be used, the presumption that the record is correct, provided in Utah Code Ann. § 78–56–6, should not apply to a transcript that was not prepared by a certified reporter.[11]

However, section 78–56–15, section 76–3–206(2), and rule 26(10) neither prohibit the use of transcripts prepared by an uncertified reporter nor revoke the presumption of correctness for transcripts prepared by uncertified reporters. Furthermore, although section 78–56–15 requires a Utah license for the position of court reporter, section 78–56–17 provides for unlicensed court reporters under certain conditions.[12] The rules of statutory construction require that these sections be read together, harmonizing their provisions so that neither section negates a part of the other.[13] Given this rule of construction, section 78–56–15 cannot be read as a total prohibition against the use of transcripts prepared by uncertified reporters. Nor can this section be read as providing that transcripts prepared by uncertified reporters are not entitled to the presumption of correctness. Therefore, Menzies' statutory argument is not compelling.

■ In any event, the trial court's ruling was not based on statutory construction, but on the finding that Lee was de facto qualified to report the case. Utah, along with many other jurisdictions, has adopted

---

7. *State v. Tillman*, 750 P.2d 546, 553 (Utah 1987). Although *Tillman* is a plurality opinion, all five justices concurred in the portion of the opinion which delineates the appropriate scope of review. *Id.* at 552–53, 577, 582, 583, 591.

8. *Id.* at 552–53.

9. *See State v. Eldredge*, 773 P.2d 29, 35 (Utah), *cert. denied*, 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989); *see also State v. Holland*, 777 P.2d 1019, 1026 n. 3 (Utah 1989).

10. Menzies also cites a similar provision in Utah Rule of Appellate Procedure 11(e). However, this rule was not in effect at the time Menzies was tried, and no analogous language exists in the Rules of the Utah Supreme Court. *See* R.Utah S.Ct. 11.

11. Utah Code Ann. § 78–56–6 provides, "A transcript of a reporter's notes, written in longhand or typewritten, certified by him as being a correct transcript of evidence and proceedings, is prima facie a correct statement of such evidence and proceeding."

12. *See infra* note 27 and accompanying text. Rule 3–304 of the Code of Judicial Administration also provides for the appointment of unlicensed reporters under conditions where certified shorthand reporters are not available.

13. *Jerz v. Salt Lake County*, 822 P.2d 770, 773 (Utah 1991); *Murray City v. Hall*, 663 P.2d 1314, 1318 (Utah 1983); *Millett v. Clark Clinic Corp.*, 609 P.2d 934, 936 (Utah 1980).

the de facto officials doctrine.[14] Under this doctrine, persons who are technically ineligible for a public office may be considered de facto officials if they assume official authority under color of a valid appointment and public acquiescence·in the authority.[15] In the interest of justice, the actions of a de facto official are considered valid as to third persons and the public.[16] Utah courts have relied on this doctrine to uphold the actions of administrative committees even though one of their members failed to meet the statutory requirements to sit on the committee;[17] the actions of district judges sitting on the supreme court;[18] and the actions of a county attorney even though the attorney had never posted a required bond.[19] Other jurisdictions have applied the de facto doctrine to myriad actions taken by various public officials,[20] including actions of de facto court reporters.[21]

The circumstances of the instant case clearly fall within this doctrine. Lee assumed authority as a court reporter under color of a valid appointment, and the public acquiesced in her authority. Indeed, throughout her tenure as a court reporter, her eligibility for the position was not questioned. Furthermore, the trial court found that on the basis of her "training, testing, and experience," Lee was qualified to transcribe Menzies' trial, and Lee believed that she had the certification necessary for the ·position. Clearly, the trial court did not abuse its discretion in ruling that Lee was de facto qualified to report the case. As a de facto reporter, any transcript which Lee prepared is entitled to the same treatment as a transcript prepared by a court reporter whose eligibility for the position is not questioned.

■ Menzies does not contend that the de facto doctrine should not apply to court reporters; rather, he argues that the trial court erred in finding that Lee possessed the qualifications for the position. In support of this assertion, Menzies points to evidence produced at the hearings which tends to show that Lee did not possess the qualifications of a court reporter under Utah Code Ann. § 78–56–16.[22] Specifically, he asserts that evidence was presented showing that Lee lacked the requisite skill and was of bad moral character. However, the existence of conflicting evidence is not sufficient to set aside a trial court's finding.[23] A trial court's factual findings will

**14.** *Vance v. Fordham,* 671 P.2d 124, 130–31 (Utah), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

**15.** *Vance,* 671 P.2d at 130–31 & n. 5; *see also State v. Gambrell,* 814 P.2d 1136, 1139 (Utah Ct.App.1991). The de facto doctrine discussed in *Vance* may also apply in situations where there is not an appointment under color of law. *Vance,* 671 P.2d at 130–31 & n. 5.

**16.** *Vance,* 671 P.2d at 130–31 & n. 5; *see also Gambrell,* 814 P.2d at 1139.

**17.** *Vance,* 671 P.2d at 130–31 & n. 5.

**18.** *In re Thompson's Estate,* 72 Utah 17, 269 P. 103, 128 (1927).

**19.** *Gambrell,* 814 P.2d at 1139.

**20.** *See, e.g., In re Bunker Hill Urban Renewal Project 1B,* 389 P.2d 538, 552 (upheld actions of redevelopment agency though one of its members ineligible because not resident of proper city), *cert. denied,* 379 U.S. 28, 85 S.Ct. 190, 13 L.Ed.2d 173 (1964); *People v. Montoya,* 44 Colo. App. 234, 616 P.2d 156, 162 (1980) (upheld action of special prosecutor who was ineligible because member of attorney general's office);

*Olathe Hospital Found., Inc. v. Extendicare, Inc.,* 217 Kan. 546, 539 P.2d 1, 12 (1975) (upheld action of appeals panel though some of panel members' terms had expired); *Marshall v. Keller,* 10 Ohio St.2d 85, 226 N.E.2d 743, 745 (1967) (upheld actions of industrial commission though some members ineligible); *People v. Jackson,* 163 A.D.2d 489, 558 N.Y.S.2d 590, 590 (1990) (upheld conviction though prosecuting attorney not member of any bar); *see also Hussey v. Smith,* 99 U.S. 20, 24, 25 L.Ed. 314 (1878); *State v. Carroll,* 38 Conn. 449, 471–72 (1871).

**21.** *Batye v. State,* 599 S.W.2d 231, 234 (Mo.Ct. App.1980); *Stacy v. Wagers,* 264 S.W.2d 299, 302 (Ky.Ct.App.1959); *Harris County v. Hunt,* 388 S.W.2d 459, 465 (Tex.Ct.Civ.App.1965).

**22.** Utah Code Ann. § 78–56–16 establishes the requirements for court reporters and provides, "Any citizen of the United States at least 18 years of age, of good moral character, who possesses a high degree of skill and ability in the art of shorthand reporting, and who passes a satisfactory examination as provided in this chapter, is entitled to a certificate...."

**23.** *See State v. Goodman,* 763 P.2d 786, 788 (Utah 1988); *State v. Walker,* 743 P.2d 191, 193 (Utah 1987).

not be disturbed unless an appellate court, giving deference to the trial court's superior position to assess credibility, nevertheless concludes that the finding is clearly erroneous.[24]

In the instant case, there was sufficient evidence concerning Lee's training, testing, and experience to support the trial judge's determination that Lee was qualified. Indeed, it was established that if Lee had kept her California certification current, she could have obtained a Utah license without taking the Utah test.[25] It appears, therefore, that if Lee had understood the need and requirements for a Utah license, she could have obtained the appropriate certification as easily as she obtained the national certification. Furthermore, the trial court had sufficient information from the testimony and the court's dealing with Lee to make a determination as to her "moral character."

In addition to the de facto doctrine, another ground supports the trial court's ruling that the transcript may be used and is entitled to the presumption of correctness. It is clear that, as a matter of law, Lee was a temporary reporter and therefore had the statutory authority to report the case pursuant to Utah Code Ann. § 78–56–17. Although the trial court did not base its ruling on section 78–56–17, we may uphold a trial court's ruling on any proper ground.[26]

Section 78–56–17 provides:

If any regularly appointed certified shorthand reporter is disabled from performing his duty or is removed from his position, the judge of the court in which that certified shorthand reporter has been appointed may appoint any substitute he deems competent to act during such temporary disability of the regular reporter and until his successor is appointed. The temporary appointment shall continue only until the next regular examination for certified shorthand reporters held by the Division of Occupational and Professional Licensing.

The administrative office of the courts determined that despite the fact that Lee did not have a Utah license, she could work as a temporary reporter pursuant to this section. This determination is undoubtedly correct. The plain language of the statute establishes that a "temporary substitute" does not have to meet the requirements of a "regularly appointed certified shorthand reporter," but only needs to be deemed competent by the trial judge.[27] In the instant case, the record clearly establishes that both the trial judge and the administrative office of the courts found that Lee was qualified for the position. Moreover, it was established that Lee was the only applicant for the position, and she reported Menzies' case between the time she was hired and the time of the "next regular examination for certified shorthand reporters."

Menzies argues that section 78–56–17 cannot apply in this case because the record does not show that Lee's predecessor was "disabled" or "removed from his position." However, the record reveals that there was a vacancy. The precise reason for the vacancy has no bearing on Lee's status as a temporary reporter. Clearly, the former court reporter must have been either "disabled" or "removed" for the vacancy to exist. Therefore, Lee had the statutory authority to report Menzies' case, and pursuant to section 78–56–

---

24. *See Goodman,* 763 P.2d at 788; *Walker,* 743 P.2d at 193.

25. Utah Code Ann. § 58–1–12 provides, "The division may issue a license without examination to a person who has been licensed in any state, district, or territory of the United States or in any foreign country, whose education, experience, and examination requirements are, or were at the time the license was issued, equal to those of this state."

26. *See* Utah R.Crim.P. 30; *see also Buehner Block Co. v. UWC Assoc.,* 752 P.2d 892, 895

(Utah 1988); *City Elec. v. Industrial Indem. Co.,* 683 P.2d 1053, 1060 (Utah 1984).

27. When the terms of a statute are plain, we construe the statute in accord with its usual and accepted meaning. *See, e.g., Brinkerhoff v. Forsyth,* 779 P.2d 685, 686 (Utah 1989); *Utah County v. Orem City,* 699 P.2d 707, 709 (Utah 1985). Indeed, apart from the plain language stating that a temporary reporter need only be "deemed competent," the provision that a temporary reporter may hold the position only until the next scheduled test supports the interpretation that an uncertified reporter may work as a temporary reporter.

17, the transcript may be used on appeal and is entitled to the presumption of correctness.

■ Menzies also argues that Lee's use of a note reader precludes the use of the transcript on appeal or, alternatively, prevents the transcript from being presumed correct. As noted above, however, it was established that certified court reporters use note readers and that the note reader Lee used was considered "excellent." While Lee did not initially proofread the entire transcript, a general procedure when using a note reader, she did read over all her notes during the proceedings to correct the record. Given these facts, there is no basis for the assertion that Menzies is entitled to a new trial because Lee used a note reader to assist in the preparation of the transcript.

We therefore conclude that the trial court did not abuse its discretion in ruling that Menzies is not entitled to a new trial by reason of Lee's licensure status and that the transcript Lee prepared is entitled to the presumption of correctness.

## III. TRANSCRIPTION ERRORS

Menzies claims that he is entitled to a new trial on the ground that transcription errors rendered the record inadequate for appeal. Specifically, he argues that the trial judge erred in ruling that a new trial will not be granted unless it is shown that the transcription errors prejudiced Menzies' appeal. In the alternative, Menzies claims that the trial court erred in ruling that none of the transcription errors are prejudicial.

### A. Requirement of Prejudice

■ Menzies' first argument, that he is not required to show prejudice, is based on Lee's licensure status and the fact that there are numerous transcription errors in the record. As held above, Lee meets the requirements of both a de facto reporter and a temporary reporter; therefore, the instant transcript is to be treated as any other transcript certified on appeal. Furthermore, while it is true that the record contains transcription errors, the mere existence of such errors does not mandate a new trial. The clear weight of authority requires a showing of prejudice to overturn a conviction on the basis of transcription errors.[28] Indeed, this court has followed such an approach.[29]

In *State v. Taylor*,[30] we reversed a conviction on the ground that omissions in the transcript rendered the record inadequate for appeal. In so holding, we did not simply note that the transcript did not accurately reflect the proceedings. Rather, we emphasized that extensive omissions in the voir dire of jurors who were challenged for cause and whose recorded answers illustrated prejudice prevented review of the defendant's claim that the trial court erred in not dismissing the jurors,[31] a claim that could have resulted in reversal.[32] We hold, therefore, that the trial court did not abuse its discretion in ruling that Menzies must show that his appeal is prejudiced by the transcription errors in order to be granted a new trial.

28. *See, e.g., Edwards v. United States*, 374 F.2d 24, 26 (10th Cir.1966); *Stirone v. United States*, 341 F.2d 253, 255 (3d Cir.), *cert. denied*, 381 U.S. 902, 85 S.Ct. 1446, 14 L.Ed.2d 284 (1965); *United States v. Sigal*, 341 F.2d 837, 850 (3d Cir.), *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); *Addison v. United States*, 317 F.2d 808, 810 (5th Cir.1963), *cert. denied*, 376 U.S. 905, 84 S.Ct. 658, 11 L.Ed.2d 605 (1964); *People v. Chessman*, 52 Cal.2d 467, 341 P.2d 679, 690–92, *cert. denied*, 361 U.S. 925, 80 S.Ct. 296, 4 L.Ed.2d 241 (1959); *People v. Feigin*, 174 Cal. App.2d 553, 345 P.2d 273, 281 (1959); *State v. Perry*, 136 Wis.2d 92, 401 N.W.2d 748, 752 (1987); *see also* Edward L. Raymond, Jr., Annotation, *Court Reporter—Dead or Disabled*, 57 A.L.R.4th 1049, 1061 (1987); Seldon R. Shapiro, Annotation, *Court Reporting—Omissions*, 12 A.L.R.Fed. 584, 586 (1972).

29. *State v. Taylor*, 664 P.2d 439, 445–47 (Utah 1983); *see also Emig v. Hayward*, 703 P.2d 1043, 1048–49 (Utah 1985); *Whetton v. Turner*, 28 Utah 2d 47, 497 P.2d 856, 858 (1972), *cert. denied*, 414 U.S. 862, 94 S.Ct. 81, 38 L.Ed.2d 112 (1973); Utah R.Crim.P. 30.

30. 664 P.2d 439.

31. *Id.* at 445–47.

32. *Id.* at 447; *State v. Bailey*, 605 P.2d 765, 768 (Utah 1980); *State v. Moore*, 562 P.2d 629, 631 (Utah 1977).

## B. *Errors Claimed to be Prejudicial*

Menzies' second argument, that many of the transcription errors are prejudicial, focuses on general errors that occurred in portions of the transcript relating to voir dire and the admission of the preliminary testimony of Walter Britton. In addition, Menzies cites specific errors relating to the transcription of numbers, the penalty phase, and the swearing in of witnesses. In a related claim, he argues that he is prejudiced because the transcription errors prevent an adequate review of the record for plain error.

However, a review of the record reveals that none of the cited errors are prejudicial. The errors are obvious in nature and reconcilable when viewed in the context of the relevant passage or by referring to documentary evidence, and none have any bearing upon issues raised on appeal. Furthermore, it is possible to cure any conceivably prejudicial errors without retrying the case. This can be seen by addressing Menzies' claims separately.

### 1. Voir Dire

Menzies advances several claims of error relating to the voir dire portion of the transcript. Specifically, Menzies asserts that (1) some of the prospective jurors' responses to questions are unintelligible and/or do not make sense, (2) the note reader "made up" admonitions, questions, and answers, and (3) questions and answers are omitted from the transcript. Because of these errors, Menzies argues that neither version of the transcript can be used to review appellate issues relating to voir dire.

Voir dire in the instant case was extensive. It lasted approximately one week, and thirty-one jurors were dismissed for cause. There was a general voir dire, during which prospective jurors were questioned as a group, followed by individual voir dire. The individual voir dire was primarily concerned with capital punishment. Menzies' original docketing statement raised two claims relating to voir dire. He asserted that the court committed reversible error by refusing to excuse certain jurors who were challenged for cause and abused its discretion by rehabilitating prospective jurors. Objections made at trial preserved these issues.

■ Before examining Menzies' specific claims, it is important to note that it is not necessary to examine the voir dire of every prospective juror. In order for mistakes in the transcript to prejudice Menzies' appeal, the error must occur in the voir dire of a juror who either sat on the case or was challenged for cause and not dismissed.

The jurors who sat on the panel are easily identifiable from the jury list, the polling of the jury after the conviction, and a second voir dire that took place late in the trial after one of the jurors received prejudicial information from an anonymous phone call. Likewise, it is possible to determine which jurors were challenged for cause and not dismissed. At the end of voir dire, defense counsel, in order to preserve her objections for appeal, stated that eight jurors were challenged for cause and not dismissed. Review of the transcript confirms the fact that eight jurors were challenged for cause and not dismissed.

#### (a) *Answers unintelligible.*

■ Several of Menzies' unintelligible or inappropriate answers cites involve voir dire of pertinent jurors. However, a review of the transcript reveals that the jurors' responses are readily reconcilable and/or nonprejudicial.

It is true that some of the jurors' answers are inarticulate.[33] However, this

---

33. The following are examples of alleged transcript errors cited by Menzies:

> A JUROR: MY NAME IS KATHLEEN WINN. I WORK FOR FIRST INTERSTATE BANK IN THE SPECIALIZED DEPARTMENT.
> . . . .
> THE COURT: WHAT RELATIONSHIP SHOULD THERE BE, IF ANY, BETWEEN WHAT THE VICTIM SUFFERED AND WHAT THAT PERSON THAT CAUSED THAT SHOULD SUFFER?
> A JUROR: AGAIN, IT'S BACK TO MY FEELINGS. IF THE INDIVIDUAL PREMEDITATEDLY OR PLANNED IT OUT THOROUGHLY AND KNEW EXACTLY WHAT HE OR SHE WAS DOING, WHICH TO ME

may well be attributable to the jurors, not to the reporter. In any event, in each instance, one is able to ascertain that the juror is appropriately responding to the question posed. Difficulties with the answers can generally be reconciled by viewing the answer in the context of the question, and in each instance, it is possible to understand the juror's response. Furthermore, a vast majority of errors cited by Menzies relate to capital punishment. However, the jurors did not sit for the penalty phase of the proceedings. These questions are not highly relevant to an appeal of Menzies' conviction, and therefore, slight confusion surrounding these questions is not prejudicial. In addition, there are only one to four errors in a given juror's voir dire, and the voir dire questions are redundant.[34] The prejudicial effect of

WOULD BE A DIFFICULT THING FOR THAT INDIVIDUAL TO DO, IF THAT INDIVIDUAL WAS PROVEN THAT THEY DID DO THAT, THEN THAT RELATIONSHIP PROBABLY SHOULD BE DEATH PENALTY.

BUT IF THE INDIVIDUAL DID NOT, WHICH MY FEELING, I GUESS. THAT THERE IS A DIFFICULT RELATIONSHIP THERE BETWEEN WHAT THE VICTIM SUFFERED VERSUS—THERE IS A LOT OF MENTAL SUFFERING, OBVIOUSLY, FROM—I WOULD HOPE FROM THE PERPETRATOR'S SIDE, AND THAT WOULD, TO ME, BE AN IMMENSE LOAD TO HANDLE.

**34.** The following is a list of the individual voir dire questions:

(1) HOW DO YOU FEEL ABOUT THE DEATH PENALTY?

(2) WHY?

(3) HAVE YOU EVER SHARED WITH ANYONE ELSE YOUR FEELINGS ON THE DEATH PENALTY?

(4) WITH WHOM?

(5) HAVE YOUR VIEWS ON THE DEATH PENALTY EVER CHANGED?

(6) ARE YOU PRESENTLY IRREVOCABLY COMMITTED TO WHAT PENALTY A PERSON CONVICTED OF FIRST DEGREE MURDER SHOULD RECEIVE?

(7) *SHOULD THIS TRIAL ENTER A PENALTY PHASE, WOULD YOU FOLLOW THE COURT'S INSTRUCTIONS AND VOTE FOR THE PENALTY ONLY IF THE STATE HAS PROVED BEYOND A REASONABLE DOUBT THAT THE AGGRAVATING CIRCUMSTANCES OUTWEIGH THE MITIGATING CIRCUMSTANCES AND THAT THE DEATH PENALTY IS THE ONLY APPROPRIATE PENALTY?*

(8) DO YOU BELIEVE THAT ALL PERSONS CONVICTED OF FIRST DEGREE MURDER SHOULD BE PUT TO DEATH?

(9) UNDER WHAT CIRCUMSTANCE DO YOU FEEL PUTTING SOMEONE TO DEATH IS WARRANTED?

(10) *DO YOU BELIEVE THE DEATH PENALTY IS ORDINARILY PROPER PUNISHMENT FOR THE CRIME OF FIRST DEGREE MURDER?*

(11) IF THE JURY SHOULD CONVICT MR. MENZIES OF FIRST DEGREE MURDER, WOULD YOU BE ABLE TO CONSIDER VOTING FOR A SENTENCE LESS THAN DEATH?

(12) IS LIFE IN PRISON A SEVERE PENALTY IN YOUR OPINION?

(13) WHAT DO YOU UNDERSTAND A LIFE TERM IN PRISON TO MEAN?

(14) WOULD YOU VOTE FOR THE DEATH SENTENCE IN ORDER TO INSURE THAT NO RELEASE FROM PRISON EVER OCCURRED?

(15) HOW DO YOU FEEL ABOUT OUR CURRENT SYSTEM OF RELEASING CONVICTED PERSONS FROM PRISON ON PAROLE AFTER APPROVAL FROM THE BOARD OF PARDONS?

(16) DO YOU BELIEVE THAT A LIFE SENTENCE COULD ACCOMPLISH THE SAME GOAL OF PREVENTING REPEATED CRIMINAL ACTIVITY IN THE SAME WAY AS THE DEATH PENALTY?

(17) DO YOU SEE ANY CONFLICTS BETWEEN THE DEATH PENALTY AND THE TEACHINGS OF YOUR RELIGION?

(18) WHAT RELATIONSHIP SHOULD THERE BE, IF ANY, BETWEEN WHAT THE VICTIM SUFFERED AND WHAT THE PERSON THAT CAUSED THAT SHOULD SUFFER?

(19) ARE YOU WILLING TO CONSIDER EVIDENCE WHICH MITIGATES IN FAVOR OF A DEFENDANT AND A LIFE SENTENCE SHOULD THIS TRIAL ENTER A PENALTY PHASE?

(20) IF A PERSON WERE TO BE CONVICTED OF FIRST DEGREE MURDER, WHAT INFORMATION WOULD YOU THEN LIKE TO KNOW BEFORE MAKING A DECISION AS TO A PENALTY?

(21) DO YOU BELIEVE A PERSON CAN CHANGE AND BECOME BETTER OVER TIME?

(22) HOW DO YOU FEEL ABOUT THE PSYCHIATRIC PROFESSION?

(23) CAN SOCIAL WORKERS OR PSYCHOLOGISTS HELP PEOPLE CHANGE?

(24) DOES THE FACT THAT QUESTIONS CONCERNING THE DEATH PENALTY HAVE BEEN ASKED RAISE DOUBTS IN YOUR MIND AS TO THE INNOCENCE OR GUILT OF MR. MENZIES?

(25) DO YOU HAVE ANY CONCERNS THAT YOU MIGHT BE CRITICIZED FOR NOT IMPOSING A DEATH PENALTY?

a transcription error in a voir dire question is diminished where the same basic information is sought in another question.[35] Given these facts, the instances of inarticulate answers are not prejudicial.

(b) *Note reader "made up" admonitions, questions, and answers.*

■ (i) Admonitions. The court reporter did not record some of the judge's admonitions. Instead, she often used asterisks to represent admonitions throughout the transcript. However, Menzies, in his original docketing statement, did not raise the claim that the jurors were subject to improper influences or acted in an improper manner. Many of the judge's admonitions were properly recorded. Furthermore, near the end of the trial, after one juror was exposed to prejudicial information, the trial judge conducted a second individual interrogation of each juror, inquiring whether any of them had been subjected to any outside influence. The record, therefore, is adequate to review any claim relating to admonitions and jury misconduct.

■ (ii) Questions. There is an indication that either the note reader or Lee failed to record each question as it was asked and simply repeated the question asked of previous jurors. This is apparent because an error in a question concerning capital punishment was repeated throughout the transcript.[36] Beginning with the third prospective juror, each juror was asked, "DO YOU BELIEVE THAT A LIFE SENTENCE COULD ACCOMPLISH THE SAME *GOAL OF REPEATED CRIMINAL ACTIVITY* IN THE SAME WAY AS THE DEATH PENALTY?" The first and second jurors were asked if life imprisonment could accomplish the goal of *preventing* repeated criminal activity. However, no juror appears to have been confused by the question. When a juror's answer involved more than yes or no, it was clear that the juror understood the question. Neither the defense nor the prosecution challenged the propriety or the content of the question. Furthermore, the prospective jurors were given a list of the questions and could read along as the judge asked them. Given these facts, it is likely that the jurors were asked the correct question.

Even assuming that this mistake cannot be reconciled, it is not prejudicial. The question is one directed toward capital punishment and is therefore not directly at issue in the case. This is particularly true in this instance, where confusion occurs only if jurors' answers are limited to yes or no. In addition, there are other appropriate questions which cover the same basic issue.[37] This error, therefore, does not prejudice Menzies' appeal.

(iii) Answers. Close examination of the pertinent prospective juror responses does not reveal any instances where the note reader "made up" actual juror answers. There are a few discrepancies between the original transcript and the court reporter's notes. However, these discrepancies are minor in nature and do not bear upon the substance of the prospective juror's response,[38] and again, a vast majority of these discrepancies occur in questions concerning capital punishment. Given these facts, the discrepancies are not prejudicial.

(26) WHAT WOULD YOUR FEELINGS BE ABOUT SERVING ON A JURY WHOSE FUNCTION IS TO TRY A FIRST DEGREE MURDER CASE WHERE IF THE PERSON IS CONVICTED, YOU WILL HAVE TO CONSIDER IMPOSITION OF A DEATH SENTENCE?

35. *See generally State v. Miller*, 727 P.2d 203, 206 (Utah 1986); *State v. Larocco*, 665 P.2d 1272, 1273 (Utah 1983); *State v. Sessions*, 645 P.2d 643, 647 (Utah 1982) (all holding no error in refusing to grant instruction if point is covered in another instruction).

36. Menzies' contention that some voir dire questions have not been recorded is addressed *infra* notes 40–48 and accompanying text.

37. Examples include:

IS LIFE IN PRISON A SEVERE PENALTY IN YOUR OPINION?
WHAT DO YOU UNDERSTAND A LIFE TERM IN PRISON TO MEAN?
WOULD YOU VOTE FOR THE DEATH PENALTY IN ORDER TO INSURE THAT NO RELEASE FROM PRISON EVER OCCURRED?
HOW DO YOU FEEL ABOUT OUR CURRENT SYSTEM OF RELEASING CONVICTED PERSONS FROM PRISON ON PAROLE AFTER APPROVAL FROM THE BOARD OF PARDONS?

38. A representative example of such a discrepancy is the following: The original transcript reads, "MY WIFE'S NAME IS DOREEN. SHE IS AN ACCOUNTING CLERK WITH EVERETT MEDICAL CENTER," while the court reporter's notes read "University Medical Center."

(c) *Omissions.*

■ Menzies asserts that the transcript lacks voir dire questions and answers. In support of this contention, he cites to portions of the transcript which deal with individual voir dire. By reason of the fact that the same questions were asked of each juror, it is possible to reconstruct the list of individual voir dire questions and compare the list with the testimony of the pertinent prospective jurors.[39] Such an approach reveals that in voir dire of two pertinent jurors, the transcript does not contain a question asked of all other pertinent jurors.[40] The individual voir dire questions were read from a prepared list; therefore, it is likely that these questions were asked but not recorded.

In arguing that these omissions require a new trial, Menzies relies on *State v. Taylor.*[41] As discussed above, in *Taylor* we ordered a new trial because omissions in the voir dire portion of the transcript rendered the record inadequate for appeal.[42] In reaching this conclusion, we noted that the omissions were extensive, the answers in the record indicated that jurors harbored prejudice, and the omissions occurred in portions of the transcript that directly related to issues on appeal.[43] In the instant case, only one question asked of two jurors was omitted, other questions cover the same basic information,[44] and the question concerns capital punishment and is therefore not directly at issue in the case. Given these circumstances, these omissions

are not prejudicial, and the instant case is clearly distinguishable from *Taylor.*

Although not cited by Menzies, the following omission in the general voir dire is also worth notice:

THE COURT: HAVE YOU OR MEMBERS OF YOUR FAMILY OR CLOSE PERSONAL FRIENDS EVER BEEN A VICTIM OF A CRIME OF A SIMILAR NATURE AS THOSE WHICH ARE INVOLVED IN THIS CASE? ...

. . . .

THE COURT: DON JACKSON. WOULD THE FACT THAT YOUR NEXT-DOOR NEIGHBOR OR THAT POLICE OFFICER WAS KILLED PREVENT YOU FROM SITTING IN ON THIS CASE AND TRYING THIS CASE ON ITS MERITS?

A JUROR: LAST WEEK I WAS ROBBED IN MY BUSINESS.

THE COURT: DO YOU FEEL YOU CAN LISTEN TO THE EVIDENCE AND THE EVIDENCE ALONE TO REACH A FAIR AND IMPARTIAL VERDICT?

A JUROR: PROBABLY.

THE COURT: OKAY. ANYONE ELSE?

It is clear from this colloquy that there is a gap in the transcript.

■ Don Jackson was dismissed for cause due to poor hearing. Therefore, the fact that portions of his responses are missing is of no concern. Rather, the diffi-

---

**39.** *See supra* note 34.

**40.** The transcription of Spencer Morgan's and Jack Wall's voir dire does not contain question nine, "UNDER WHAT CIRCUMSTANCE DO YOU FEEL PUTTING SOMEONE TO DEATH IS WARRANTED?" Menzies claims that the attorneys, in argument concerning cause, referred to questions that are not found in the transcript. However, his cites do not support this contention.

**41.** 664 P.2d 439 (Utah 1983).

**42.** *Id.* at 447.

**43.** *Id.* at 445–47.

**44.** Some examples of similar questions are the following:

(10) DO YOU BELIEVE THE DEATH PENALTY IS ORDINARILY PROPER PUNISHMENT FOR THE CRIME OF FIRST DEGREE MURDER?
(11) IF THE JURY SHOULD CONVICT MR. MENZIES OF FIRST DEGREE MURDER, WOULD YOU BE ABLE TO CONSIDER VOTING FOR A SENTENCE LESS THAN DEATH?
(19) ARE YOU WILLING TO CONSIDER EVIDENCE WHICH MITIGATES IN FAVOR OF A DEFENDANT AND A LIFE SENTENCE SHOULD THIS TRIAL ENTER A PENALTY PHASE?
(20) IF A PERSON WERE TO BE CONVICTED OF FIRST DEGREE MURDER, WHAT INFORMATION WOULD YOU THEN LIKE TO KNOW BEFORE MAKING A DECISION AS TO A PENALTY?

culty is that it is not possible to tell from this portion of the transcript whether the gap incorporates testimony of other jurors. Nonetheless, this gap is not prejudicial.

■ As noted above, it is possible to identify jurors who were challenged for cause and not dismissed.[45] In the arguments concerning whether these jurors should have been dismissed for cause, there was no mention of any concerns stemming from their prior experience with violent crime. It is clear, therefore, that Menzies did not object to any juror on any basis related to the missing testimony. In addition, when problems arose in the general voir dire, the jurors were questioned further on the subject in individual voir dire. None of the pertinent jurors were questioned concerning prior experience with violent crime. Thus, the record indicates that the pertinent jurors' testimony did not raise questions concerning their experience with violent crime. Furthermore, although there were no other questions dealing directly with past experience with violent crime, several other questions dealt with the presumption of innocence and prospective jurors' prejudice against criminal defendants.[46] Given these facts, this omission is distinguishable from the omissions in *Taylor* and does not prejudice Menzies' case on appeal.[47]

The record is adequate to provide Menzies with a full and fair review of any claim relating to jury selection.

### 2. Britton Issue

■ Menzies claims that he is prejudiced by the numerous transcript errors in portions of the record relating to the admission of the preliminary hearing testimony of Walter Britton. Britton was imprisoned in the Salt Lake County jail at the same time as Menzies. At Menzies' preliminary hearing, Britton testified that Menzies had confessed to the murder. However, Britton refused to testify at trial on the ground that he feared reprisals from other inmates. The trial court ruled that Britton was unavailable under Utah Rule of Evidence 804, and his preliminary hearing testimony was read to the jury. In his docketing statement, Menzies asserts that he was denied his right of confrontation due to the fact that he was not able to cross-examine

---

45. *See supra* section III.B.1.

46. During the general voir dire, the jurors were repeatedly asked if they could "LISTEN TO THE EVIDENCE AND THE EVIDENCE ALONE AND REACH A FAIR AND IMPARTIAL VERDICT." In addition, in the individual voir dire, the jurors were asked if "THE FACT THAT QUESTIONS CONCERNING THE DEATH PENALTY HAVE BEEN ASKED RAISE DOUBTS IN YOUR MIND AS TO THE INNOCENCE OR GUILT OF MR. MENZIES."

47. Omissions present different problems of determining prejudice than other transcript errors. Often, it is not possible to tell how much testimony is missing, and therefore, it is not possible to determine if an appealable issue arose in the unrecorded portion of the proceeding. In dealing with the prejudicial effect of transcript omissions in noncapital cases, courts have focused on whether the omission impacted issues that had been preserved at the trial level and raised on appeal. *See Taylor,* 664 P.2d at 445; Seldon R. Shapiro, Annotation, *Court Reporting—Omissions,* 12 A.L.R.Fed. 584, 586 (1987). Such an approach may not be appropriate in capital cases, where we often review errors raised for the first time on appeal. *State v. Holland,* 777 P.2d 1019, 1026 (Utah 1989). In addition, we have "the sua sponte prerogative ... to notice, consider, and correct [plain] error

which is not ... assigned on appeal, but is palpably apparent on the face of the record." *State v. Tillman,* 750 P.2d 546, 552–53 (Utah 1987) (footnote omitted).

There is always a slight possibility that plain error occurred in a portion of the missing transcript. However, this court has never ordered a new trial based on the mere possibility that absent an error, a different result could have occurred. Rather, we will reverse if there is a reasonable likelihood that the error affected the outcome of the proceedings, *State v. Verde,* 770 P.2d 116, 120 (Utah 1989), or when the error affects a federal constitutional right, if there is a reasonable doubt that the error affected the outcome of the proceeding, *State v. Tuttle,* 780 P.2d 1203, 1213 (Utah 1989), *cert. denied,* 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990). A criminal defendant in a capital case does not have a constitutional right to an independent review of the record for plain error. *See Tillman,* 750 P.2d at 552–53 (independent review of record not mandatory). Therefore, since no objection was made at trial on the basis of this testimony and this omission was not cited by Menzies in this appeal, the omission cannot be the basis for a new trial unless there is a reasonable likelihood that a manifest and palpable error occurred in the missing portion of the transcript. That standard has not been met.

Britton on information learned subsequent to the preliminary hearing and the fact that a subpoena served on the State's counsel was quashed. Menzies also claims that the trial court erred in ruling that Britton was unavailable.

The factual basis for these claims is provided through the testimony of Mr. Savage, Britton's attorney. Savage testified at a pretrial hearing and during trial. His testimony concerned Britton's competence and a rule 35 hearing in federal court. In the rule 35 hearing, it was argued that because Britton cooperated in the State's case against Menzies, his federal sentence should be reviewed. One of the prosecuting attorneys testified briefly in this hearing. During the trial, Menzies subpoenaed the prosecutor to testify regarding his participation in the federal hearing. The only other relevant testimony is the reading of the preliminary hearing transcript and Britton's pretrial hearing testimony concerning why he would not testify at trial. Menzies cites more than sixty errors relating to this portion of the transcript. Virtually all of them relate to insignificant grammatical or spelling problems or to mistranscriptions where the actual sense of the testimony is obvious. None of the cited errors prejudice Menzies' ability to pursue his claims on appeal. Nor is there any error significant enough to interfere with an independent review of the trial court's decision.

(a) *Testimony.*

In the relevant testimony, there are instances of discrepancies between the court reporter's notes and the original transcript[48] and instances of inarticulate statements.[49] However, these errors are reconcilable when read in context and/or have no relevance to appellate issues. Nevertheless, Menzies points to this portion of the transcript to illustrate his claim that the transcript prejudices his ability to appeal. Specifically, he claims that confusion in the transcript concerning whether Savage first discussed a rule 35 hearing with prosecutors before or after Menzies' preliminary hearing prejudices his ability to raise issues regarding Britton's motive for testifying in the preliminary hearing.[50]

It is true that conflicting dates are given concerning this conversation. In a proffer of proof made to the court, a prosecutor claimed that if Savage testified, he would state that the first time he had contact with the prosecuting attorneys was on May 26, after the preliminary hearing. Savage, in fact, testified that he first had contact with the prosecutors on May 2, prior to the preliminary hearing. Read in context, this conflict is clearly not the result of a transcription error but rather the result of the attorney's confusion as to what evidence Savage would provide. Indeed, confusion as to whether the first discussion occurred before or after the preliminary hearing was

---

**48.** The following occurred during the hearing testimony of Britton: "Q. YOU HAVE MAILING PRIVILEGES, DON'T YOU?

A. YES, MA'AM, I DO. Q. YOU ALSO HAVE TELEVISION [court reporter's notes read "telephone"] PRIVILEGES, DON'T YOU?

A. YES, MA'AM, I DO." Although there is a discrepancy in the transcript, the important information, that Britton had access to news reports concerning the murder, is present in the transcript.

**49.** Britton also stated:

NO, MA'AM, IT'S NOT. IF I MAY TAKE AND INTERRUPT FOR A MINUTE. *I HAVE TAKEN PLACES ON THE RECORD* THAT I WILL NOT TESTIFY IN THIS HEARING, AND I HAVE LISTENED TO BOTH OF YOU. YOU HAVE TOOK AND PLACED MY LIFE IN DANGER, NOT DIRECTLY BECAUSE OF RALPH MENZIES, BUT BECAUSE OF TESTIFYING IN ITSELF IN THE ENVIRONMENT I

LIVE IN, AND I WILL NOT AND I REPEAT WILL NOT SAY ANYTHING MORE BECAUSE IT IS FOR MY OWN HEALTH. (Emphasis added.) Even assuming that the difficulty with this statement is the result of transcription errors and not the result of Britton's own misstatements, the essential information is preserved for the record.

**50.** There is also some confusion concerning the date of the second contact between Savage and the prosecutors. Savage's testimony concerning the second contact was as follows:

"Q. WHAT'S THE DATE. A. 7–3–86 [court reporter's notes read "7–30–86"]. Q. WAS THIS PRIOR TO THE RULE 35 HEARING? A. YES, JUST A FEW DAYS." Although there is confusion as to the exact date of this contact, it is clear that it occurred shortly before the rule 35 hearing and after the preliminary hearing. In any event, the exact date of this second contact has no relevance to any appellate issue.

one of the reasons the trial judge allowed Savage to testify at the hearing. Therefore, it is clear not only that there is no prejudicial error in the transcript, but also that the transcript supports Menzies' claim that Britton had a motive to testify falsely.

### (b) *Argument.*

The vast majority of the errors which Menzies cites do not deal with testimony but rather with arguments held outside the presence of the jury. In fact, of the sixty cited errors, more than fifty deal with argument. It appears that the reporter had more difficulty transcribing argument, where the discussions were more heated.[51]

Errors in transcribing arguments made outside the presence of the jury are of less significance than errors in other portions of the transcript. This is because these arguments are relevant to appeals only in reviewing trial court rulings, reviewing proffers of evidence, and determining what issues were raised in the trial court. In the instant case, Menzies does not cite any errors in the trial court's rulings, and there is no indication that the court's rulings were incorrectly transcribed. Likewise, there are no references to the record or other indications, other than the one in-

stance discussed above, that an error occurred in the transcription of a proffer of evidence. All of the cited errors relate only to whether a particular argument concerning the admission of testimony was not raised at trial and therefore should be reviewed under a plain error standard.[52]

The errors that occurred in the arguments are similar to the errors that occurred throughout the transcript. There are discrepancies between the original transcript and the court reporter's notes,[53] instances where the attorney's arguments are inarticulate,[54] and instances where there is confusion concerning who is speaking.[55] However, because it is only necessary to determine what issues were being raised, problems with one or two words or statements are more readily reconcilable than errors occurring in other portions of the transcript. This is particularly true in the instant case, where there were three separate arguments concerning the admission of the preliminary hearing testimony. In each hearing, many of the same issues were raised. Given the rather extensive argument, there is no difficulty in determining what issues were presented to the trial court.

---

51. *See infra* note 55.

52. *See supra* notes 7–9 and accompanying text.

53. An example occurred in arguments over whether a prosecuting attorney would have to testify and then be recused from the case. The prosecuting attorney stated: "IT'S RIDICULOUS. IT REALLY IS. I CAN'T USE ANY OTHER WORDS, JUST NOT LEGITIMATE TO SAY, 'HEY, OUGHT TO BE RECUSED [reporter's notes read "REDUCED"].'" It is clear from the context that recused is the correct term. Furthermore, the extensive argument on this point leaves no doubt as to what the parties' positions were on this subject.

54. An example is a statement by Menzies' counsel: "SO WE WOULD FURTHER HAVE FIRST OF ALL INDICATED TO THE COURT THAT HE WAS NOT UNAVAILABLE." The meaning of this statement is clear.

55. In one instance, the court reporter's notes did not identify who was speaking and the note reader inserted the names of the speakers. This type of problem is unusual and may be related to the contentious nature of the argument.

However, read in context it is possible to tell who is actually speaking. In any event, understanding this specific exchange is not necessary to determine what issues were being raised:

IN YOUR SITUATION, YOURS WAS AN ARGUMENTATIVE ADVOCACY ROLE OR ACTIVE ROLE ON BEHALF OF A PARTICULAR CLIENT WHOSE CREDIBILITY IS IN QUESTION. THEY ARE TWO—ENTIRELY DIFFERENT THINGS, RICK, AND I CAN CERTAINLY PROVIDE YOU WITH THE CASES THAT—IN WHICH COUNSEL HAVE BEEN PLACED IN THAT POSITION, AND YOU CAN SEE WHAT THOSE ARE.
[Note reader inserts "MR. JONES:"] BUT THAT'S THE ENTIRE PURPOSE FOR YOUR RIGHT. EVERYBODY WOULD BECOME A WITNESS WHO INTERVIEWS ANYONE UNDER THOSE CIRCUMSTANCES. [Possible change of speaker not indicated in transcript.] THESE TWO SITUATIONS ARE ENTIRELY DIFFERENT. AND YOUR CREDIBILITY BECOMES AT ISSUE. MS. WELLS: MR. JONES—[added by note reader].
MR. JONES: OH, GOD, THIS IS ABSURD.
MS. WELLS: YOUR LAUGHING IS INTERRUPTING.

Menzies, however, points to a specific error in this portion of the transcript as illustrative of how the transcript prejudices his case on appeal. In a hearing held before trial, there was some confusion concerning what rule of evidence the attorneys were arguing. It appears from the context of the hearing that the attorneys were discussing rule 804(a). However, regardless of what rule was being argued, Menzies is not prejudiced by this confusion. The purpose of the hearing was to establish if Britton must be brought into court to determine if he would not testify. The court ruled in favor of Menzies. Therefore, any error in the transcription of this hearing does not impact Menzies' appeal.

None of the errors relating to the admission of Britton's preliminary hearing testimony are prejudicial.

### 3. Specific Errors

A section of Menzies' brief is devoted to establishing that specific transcription errors prejudice his ability to raise particular claims on appeal. Specific errors which deal with voir dire or the admission of Britton's preliminary hearing testimony have been addressed above. The remaining errors deal with the transcription of numbers, the penalty phase, and the swearing in of witnesses. However, when these errors are viewed in the context of the testimony and in the context of the specific appellate issue, it is clear that they are not prejudicial. Indeed, this section is particularly illustrative of how minor transcription errors and discrepancies will generally have very little impact on appeal.

#### (a) *Numbers.*

Throughout the transcript, it appears that the court reporter had particular difficulty in transcribing numbers. Therefore, there is often confusion concerning addresses, distances, and dates. Menzies claims that these errors prejudice his ability to raise claims concerning the admission of identification cards belonging to the victim, the identification of Menzies as a man seen near the location where the victim's body was found, sufficiency of the evidence

to convict Menzies of robbery and kidnaping, and an unspecified claim regarding statements Menzies made to police officers. Each claim will be addressed separately.

■ (i) Admission of identification cards. During the trial, the victim's social security card, found among Menzies' possessions, and three other identification cards belonging to the victim, found at the Salt Lake County jail, were admitted into evidence. Menzies objected at trial to the admission of all the cards. However, in his docketing statement he claims only that the court erred in the admission of the social security card on the ground that it contained inadmissible hearsay. In this appeal, he claims that discrepancies concerning dates and a stipulation prejudice his ability to pursue claims concerning the admission of these cards.

At the time of the murder and prior to his arrest, Menzies was living with Nicole Arnold. After Menzies' arrest but before trial, Arnold met and married Rodney Duffy. When Duffy was moving Arnold's possessions into his house, he found the victim's social security card. He took the card to Arnold's mother, Janet Franks, who phoned the police. The police arrived and took possession of the card. This all occurred on the same day the card was found.

At trial, the State called the victim's husband, who identified the social security card, Duffy, Franks, and the police officer who took possession of the card. In cross-examination of Franks, Menzies emphasized that Franks was confused as to the year she received the social security card. The discrepancy which Menzies claims prejudices his appeal occurred during this questioning.

Menzies' counsel asked, "WAS THE CARD GIVEN TO YOU SOMETIME IN 1986 [court reporter's notes read "1987"], BEING SEVERAL MONTHS AGO, OR WAS IT GIVEN TO YOU IN 1987 [court reporter's notes read "1986"], UP TO A YEAR AND SOME MONTHS AGO?" This line of questioning continued until Franks stated that she had no idea what year she received the social security card.

This discrepancy is not prejudicial. The context of the sentence itself establishes the correct dates. The transcript clearly contains the information the question was designed to elicit—that the witness did not remember what year she received the social security card. The police officer who took custody of the card testified that he received the card in 1986. Furthermore, the error does not relate to Menzies' claim that the card contains inadmissible hearsay.

■ The discrepancy relating to the admission of the other identification cards is similarly insignificant. During Menzies' booking process, he suddenly broke away from the jailers and ran into a dressing room. He was alone in the dressing room for several seconds. Later that day, a jail employee, Jay Smith, found three identification cards belonging to the victim in a hamper in the dressing room. Not realizing the significance of the cards, Smith placed them in a drawer in the room. A few days later, a jailer, Officer Valdez, recovered the cards.

At trial, the State called the jailers who booked Menzies into jail, Smith, and Valdez. Menzies' attorney asked Valdez how he was sure he found the cards after February 24, the date Menzies was booked into jail. Valdez testified that he could refer to his work schedule, particularly the type of duties which he performed, to help him remember the approximate date on which he recovered the cards. The discrepancy which Menzies claims prejudices his appeal occurred in the follow-up questions: "Q. DID YOU WORK ON THE 26TH [court reporter's notes read "22nd"] OF FEBRUARY? A. NO, MA'AM." Menzies claims that this discrepancy makes it impossible to determine if Valdez discovered the cards before or after Menzies was booked.

However, given Valdez's testimony that he remembered the approximate date on which he found the cards by recalling the type of duties he performed that day, the exact dates on which Valdez did not work are not highly relevant. The transcript clearly establishes that Valdez testified that he found the card after the 24th.

Smith testified that he found the card on the 24th. Furthermore, Menzies did not ask the trial judge not to admit the cards because Valdez found them before Menzies was booked. Nor was any such argument made to the jury. Finally, even assuming that a transcription error prejudices Menzies' ability to raise claims concerning the admission of the cards found at the jail, this should not result in a new trial. Given the strong evidence of guilt and the admission of the victim's other identification cards, any error in the admission of these cards would be harmless.

Menzies' claims that a discrepancy in a stipulation as to how long the booking process lasted is prejudicial. He contends that a shorter booking process would establish that he did not have time to hide the cards in the hamper. However, no such argument was ever raised at trial. The testimony of several jailers established that Menzies was alone in the dressing room for a few seconds. The length of the booking process does not impact on the length of time Menzies was alone in the dressing room. In any event, it is clear from the transcript that the stipulation in question does not purport to establish what time the booking process was completed.

■ (ii) Identification of Menzies. Tim Larabee was at Storm Mountain, where the victim's body was found, during the time the victim was missing and before her body was discovered. He testified that he twice saw a man and a woman walking together, heard a scream, and then saw the man leave alone. At trial, Larabee identified the man as Menzies.

In the transcript, there is a discrepancy concerning whether Larabee first saw the man and the woman from a distance of twenty or fifty yards. However, this discrepancy is easily reconcilable. When asked the same question on cross-examination, Larabee stated that the distance was fifty yards. In any event, the distance from which Larabee first viewed the man is not particularly relevant. Larabee did not see the man's face until he saw the man for the third time.

**238**

There is also a discrepancy concerning the date on which a composite drawing was prepared from Larabee's description. This discrepancy, however, is resolved by comparing the testimony of Larabee and the police officer who prepared the drawing. No motion was ever made to suppress the identification, and no claim concerning the identification was presented in Menzies' docketing statement.

■ (iii) Insufficient evidence of kidnaping and robbery. At trial and in his docketing statement, Menzies maintains that there was insufficient evidence to convict him of kidnaping and robbery, the convictions used to elevate the homicide to first degree murder. Menzies claims that a discrepancy concerning the amount of money taken from the gas station prejudices this claim. However, the discrepancy did not occur in the testimony but rather in the State's closing argument. The prosecutor stated, "THAT FINAL AUDIT DETERMINED THAT THERE WAS SOMEWHERE BETWEEN $115 [court reporter's notes read "$114"] AND $116 MISSING.... AND IT WAS CERTAINLY A FIGURE REMARKABLY CLOSE TO THE $115 WHICH MR. DENTER TESTIFIED TO WHEN HE SAID HE REMOVED THAT AMOUNT CONCEALED IN AN UMBRELLA AT THE DEFENDANT'S RESIDENCE." Because this discrepancy does not concern evidence but rather the prosecutor's closing argument and because there was confusion in the evidence concerning the exact amount of money at issue, this discrepancy is not prejudicial.

■ (iv) Menzies' statement to the police. The State called Officer Thompson, who testified about an interview he had with Menzies concerning Menzies' whereabouts the night the victim disappeared. Thompson testified that Menzies told him that on the night in question, he picked up a woman who was hitchhiking. Menzies and the hitchhiker drove around for a while and talked, and then he took the hitchhiker

to his house. At approximately 2:30 a.m., Arnold, Menzies' girlfriend, phoned from a trailer park and asked Menzies to take her home. Menzies and the hitchhiker picked up Arnold and returned to Menzies' house, where Arnold and the hitchhiker had a fight. Menzies and the hitchhiker left the house, drove around, and got stuck in the mud. The hitchhiker left Menzies at this point, and Menzies returned home to Arnold.

Menzies claims that he is prejudiced by discrepancies in the date on which the interview took place, the location where he picked up the hitchhiker, and the location where the car got stuck in the mud. However, he does not identify what claim these discrepancies prejudice. Menzies did not object to the admission of this evidence.[56] In fact, during cross-examination, Menzies' counsel attempted to bolster Menzies' story. Given the fact that this evidence supported Menzies' case, an erroneous ruling admitting this evidence cannot be prejudicial. Furthermore, this evidence conflicts with other evidence which supports the jury's verdict. Therefore, an appellate court would not consider this evidence in ruling on an insufficient evidence claim.[57] Thus, no transcription error in this portion of the transcript could possibly prejudice Menzies' appeal.

In any event, the relevant content of this testimony is preserved in the transcript. The exact date on which the interview took place is insignificant, and from the context of the testimony, it is clear that the interview took place between February 23 and February 29. On cross-examination, it was established that Menzies picked up the hitchhiker at a location near Mark's Lounge, a club where the victim had a membership. The location in which Menzies claims to have been stuck in the mud is of no consequence. The relevant information—that Menzies has an explanation for

---

**56.** Menzies objected and moved for a mistrial on the ground that Thompson testified that the next day, Menzies went to the parole office. However, Menzies does not claim that transcrip- tion errors prejudice his ability to pursue this claim.

**57.** See, e.g., State v. Warden, 813 P.2d 1146, 1150 (Utah 1991).

the mud found on and in the car—is in the transcript.

#### (b) *Penalty phase.*

Menzies asserts that transcription errors in the penalty phase prejudice his ability to claim that the death penalty was improperly imposed, a claim that Menzies raises in his docketing statement. However, the errors Menzies cites are either reconcilable or inconsequential. The transcript is thus sufficient for this court to review the penalty phase and determine if the " 'sentence resulted from prejudice or arbitrary action or was disproportionate.' "[58]

■ A discrepancy occurred in transcribing the testimony concerning the qualifications of a defense expert witness. There is confusion as to whether the witness based a pilot study on one or one hundred patients. It would seem clear that a pilot study would be based on more than one patient. However, even assuming the error cannot be reconciled, it is insignificant. The discrepancy involves only one question, and the questioning concerning the witness's qualification was extensive, covering over nine transcript pages. The record clearly establishes that the witness was qualified to testify as an expert.

There are also discrepancies in the testimony concerning Menzies' I.Q. percentile. However, other portions of the record indicate that Menzies was functioning in the "average range of intellectual functioning." Testimony concerning a diagnosis contained in a psychological evaluation Menzies underwent as a juvenile is unintelligible. However, the transcript can be reconciled by referring to the evaluation, which was entered into evidence. In any event, the important information—that Menzies' expert witness's opinion differs from the opinion expressed in the evaluation—is present in the record.

While there are other errors in the penalty phase, the basic information Menzies offered at trial is present in the record and adequate to review his claims.

#### (c) *Swearing in of witnesses.*

■ Menzies claims that because the court reporter used asterisks to represent the swearing in of witnesses, it is impossible to tell if the witnesses were sworn.[59] However, the use of symbols to represent redundant occurrences such as the swearing in of a witness is simply a method of shorthand. Although Menzies cites to the transcript to support his claim, both the transcript and the court record indicate that the witnesses were properly sworn. Furthermore, there was no claim at trial or in the docketing statement relating to the swearing of witnesses.

It is evident from the record that none of the errors cited by Menzies as prejudicial substantially affect his ability to appeal his conviction or sentence.

### 4. Plain Error

■ Menzies also claims that he is prejudiced because the transcription errors prevent appellate counsel or the supreme court from adequately reviewing the record for plain error. Implicit in this argument is the assertion that because it is so difficult to determine how transcription errors affect a review for plain error, Menzies should not be required to establish which transcription error prejudices such a review. This assertion is without merit.

The only added difficulty in determining whether a mistake in the transcript prejudices a claim of plain error, as opposed to an error that has been properly preserved, is determining what appellate issue the transcription error impacts. However, unless the transcript is so inarticulate that it is impossible to tell what evidence is being offered or what issue is being argued, it is always possible to determine what appellate claims a transcription error impacts by viewing the error in the context of the

---

58. *State v. Holland,* 777 P.2d 1019, 1026 (Utah 1989) (quoting *State v. Pierre,* 572 P.2d 1338, 1345 (Utah 1977)).

59. Menzies also claims that the names of three witnesses who the court reporter indicated were sworn when the exclusionary rule was invoked are not included in the transcript. However, Menzies' cite does not support this contention.

relevant passage. This is particularly true in case of plain error, where the error must be both harmful and obvious.[60]

It is true that a record could be so severely affected by transcription errors that it would be impossible to ascertain what arguments are being made or what evidence is being offered. However, a review of the entire record reveals no instance where it is impossible to determine what conceivable appellate issues are impacted by specific errors. Since transcription errors of such a magnitude that might render significant portions of the record inarticulate would be obvious in nature, it is clear that the condition of the record does not prevent review for plain error.

Indeed, there is only one instance where due to a transcription error, plain error might have occurred. During the testimony of the medical examiner, a juror fainted. The transcript reads as follows:

DR. SWEENEY, DID YOU FIND ANYTHING ELSE DURING YOUR INTERNAL EXAMINATION?

THE COURT: LETS CALL A RECESS HERE. JUST A MOMENT.

HAVE THEM TAKE THE JUROR OUT. ONE JUROR FAINTED.

(TAKING THE JUROR OUT.)

MR. JONES: JUDGE WITH REFERENCE TO WHICH EXHIBIT IS IT? IT'S THE IDENTIFICATION OF MAUREEN HUNSAKER. THE DEFENSE APPARENTLY OBJECTED ON THE GROUNDS THEY FELT THERE WAS MORE FOUNDATION REQUIRED....

MS. WELLS: EXCUSE ME, JUST A MINUTE, I DIDN'T MEAN TO INTERRUPT, BUT THE DEFENDANT IS NOT HERE.... HE NEEDS TO BE PRESENT YOUR HONOR....

MR. JONES: WE CAN MAKE THE ARGUMENT, AGAIN.... I JUST THOUGHT MAYBE WE CAN RESOLVE THIS, SOME OF THIS STUFF.

THE COURT: WHAT PARTICULARLY HAPPENED DURING THE JURORS— DURING THE COURSE OF THE TRIAL. RICK WOULD BE A LITTLE MORE SUBTLE OR SOPHISTICATED. WE WILL RECESS UNTIL 2:00 P.M. (RECESS UNTIL 2:00 P.M.)

After the recess, the juror who fainted was brought into court and explained that she fainted due to the nature of the testimony and the fact that she had not eaten. She also stated that she had eaten lunch, remembered the medical examiner's testimony, and was able to continue.

It is clear that an omission occurred in this portion of the transcript. It is also clear that some discussion was held at this point. Nonetheless, any prejudice Menzies suffers because of this error can be cured.

All of the medical examiner's testimony is present in the record. Also, the court's discussion with the juror who fainted is properly recorded.[61] Therefore, the error only impacts a discussion held outside the presence of the jury. Although the court's statement is unintelligible, the statements of the prosecutor indicate that no ruling was made and the issues discussed were reargued later in the proceedings. Therefore, it would appear that Menzies suffered no prejudice from this omission. Indeed, there is no contention that anything of significance occurred at this point in the proceedings.

 In any event, it is possible to cure the fact that some of the arguments are missing without ordering a new trial. All that is necessary to insure that Menzies in not prejudiced by this omission is to review any claim that could have conceivably been raised at this point as though it had been properly preserved.[62]

Given the fact that no prejudicial transcription error has been identified, the trial court did not abuse its discretion in ruling that the transcript was adequate for an appeal. The record is sufficient to proceed

---

**60.** *See supra* notes 7–9 and accompanying text.

**61.** The record is sufficient to review any claim concerning the effect one juror's fainting had on the other members of the jury. *See supra* section III.B.1(b)(i) (relating to the omission of admonitions).

**62.** *See supra* notes 7–9 and accompanying text.

with an appeal on the merits. If, in the context of discussing specific appellate issues, Menzies can demonstrate that a transcription error prejudices his case, it would be proper to grant him a new trial at that time. However, absent an indication that errors prejudice his ability to raise or identify appellate issues, the existence of transcription errors alone does not justify a new trial.

## IV. CONSTITUTIONAL CLAIMS

Menzies argues that several provisions of the state and federal constitutions prohibit the use of either transcript on appeal.

■ Specifically, he claims that the use of the transcripts interferes with his ability to appeal his death sentence and therefore violates his right to be free from cruel and unusual punishment under the eighth amendment of the federal constitution and his right to due process of law under the fourteenth amendment of the federal constitution. It is true that the eighth and fourteenth amendments require states which impose capital punishment to develop a sentencing scheme that genuinely narrows the class of persons upon whom the death penalty can be imposed and provides a meaningful basis for distinguishing the cases in which an individual is sentenced to death.[63] It is also true that in states such as Utah, where the fact finder weighs aggravating and mitigating factors in the decision to impose the death penalty, a "meaningful appellate review" of the penalty phase has been held to be an essential component of the sentencing scheme.[64] However, since none of the transcription errors prejudice Menzies' appeal, use of the transcripts does not deprive him of a "meaningful appellate review." Accordingly, use of the transcripts on appeal will

not violate his rights under the eighth amendment or the due process clause of the fourteenth amendment.

■ In a separate argument, Menzies claims that the transcription errors limit his ability to appeal and therefore the use of the transcripts will deprive him of his right to equal protection under the fourteenth amendment of the federal constitution. Utah law affords persons sentenced to death the right to an appeal and the right to the use of a transcript on appeal.[65] The right of appeal is a fundamental right. Therefore, Menzies has a federal constitutional right under the equal protection clause of the fourteenth amendment to the use of a transcript.[66] However, there is no constitutional right to a perfect transcript. Rather, criminal defendants have the right to a "record of sufficient completeness to permit proper consideration of [their] claims." [67] As noted above, the transcription errors in the instant case do not prevent "proper consideration of [Menzies'] claims." Therefore, use of the transcripts does not violate equal protection.

Menzies argues that the condition of the transcripts prevents defense counsel from adequately reviewing the record and therefore denies Menzies' sixth amendment right to assistance of counsel. It has already been determined that the transcription errors do not interfere with appellate counsel's review of the record. Therefore, this claim also fails.

■ In addition to claims under the federal constitution, Menzies also argues that the use of the transcripts will violate numerous provisions of the state constitution. However, at no time in the proceeding has Menzies provided any analysis for this assertion, other than arguing that in certain

63. *Jurek v. Texas*, 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976); *Furman v. Georgia*, 408 U.S. 238, 293–95, 92 S.Ct. 2726, 2754–55, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring); *State v. Wood*, 648 P.2d 71, 77 (Utah 1981), *cert. denied*, 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982).

64. *Parker v. Dugger*, 498 U.S. 308, 111 S.Ct. 731, 739, 112 L.Ed.2d 812 (1991).

65. *See* Utah Const. art. I, § 12; Utah Code Ann. § 76-3-206(2).

66. *See, e.g., Griffin v. Illinois*, 351 U.S. 12, 18–19, 76 S.Ct. 585, 590–91, 100 L.Ed. 891 (1958); *Dowd v. United States*, 340 U.S. 206, 208–10, 71 S.Ct. 262, 263–64, 95 L.Ed. 215 (1951).

67. *Draper v. Washington*, 372 U.S. 487, 499, 83 S.Ct. 774, 780–81, 9 L.Ed.2d 899 (1963).

circumstances state constitutions may provide greater protections to criminal defendants than the federal constitution. Therefore, these claims will not be addressed. As we have previously stated, "[T]he mere mention of a claim of error ... is not necessarily enough, even in death cases, to require that we engage in a full-blown analysis of the claim. Unless the error is manifest on the record, not only must it be raised, but an argument must be briefed." [68]

 Menzies' final claim is based on the assertion that the prosecutor supplemented the record without his knowledge or consent. He claims that this violated several provisions of the federal constitution. However, the State has stipulated to the removal of the prosecutor's comments. Therefore, the ex parte supplementation of the record is harmless and does not constitute grounds for a new trial.[69]

We conclude that the trial court did not abuse its discretion in denying the motion for a new trial. We therefore order Menzies to proceed with the appeal on the merits. As noted above, in the appeal on the merits Menzies may attempt to demonstrate how certain transcription errors prejudice his appeal. Furthermore, due to the omission which occurred during the medical examiner's testimony, we will review any claim that conceivably could have been raised at that point as though it was properly preserved. Other than this one instance, the transcription errors do not impact Menzies' appeal.

Affirmed.

HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.

STEWART, J., dissents.

---

68. *State v. Lafferty,* 749 P.2d 1239, 1247 n. 5 (Utah 1988) (habeas corpus granted on other grounds in *Lafferty v. Cook,* 949 F.2d 1546 (10th Cir.1991)).

69. *See State v. Tuttle,* 780 P.2d 1203, 1213 (Utah 1989), *cert. denied,* 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990).